RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0051p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

LEE E. MOORE,
        *Petitioner-Appellee/Cross-Appellant*,

                v.

BETTY MITCHELL, Warden of Mansfield
Correctionial Institution,
        *Respondent-Appellant/Cross-Appellee.*

Nos. 08-3167/3230

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 00-00023—Susan J. Dlott, Chief District Judge.

Argued: April 20, 2011

Decided and Filed:  February 26, 2013

Before:  BATCHELDER, Chief Circuit Judge; MERRITT and GIBBONS, Circuit
Judges.

_____

## COUNSEL

**ARGUED:** Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL,
Columbus, Ohio, for Appellant/Cross-Appellee.  Michael J. O'Hara, O'HARA,
RUBERG, TAYLOR, SLOAN & SERGENT, Covington, Kentucky, for Appellee/Cross-
Appellant.  **ON BRIEF:** Charles L. Wille, OFFICE OF THE OHIO ATTORNEY
GENERAL, Columbus, Ohio, for Appellant/Cross-Appellee.  Michael J. O'Hara,
O'HARA, RUBERG, TAYLOR, SLOAN & SERGENT, Covington, Kentucky,
Laurence E. Komp, Manchester, Missouri, for Appellee/Cross-Appellant.

        BATCHELDER, C. J., delivered the opinion of the court in which, GIBBONS,
J., joined.  MERRITT, J. (pp. 61–64), delivered a separate dissenting opinion.

_____

## OPINION

_____

        ALICE M. BATCHELDER, Chief Circuit Judge.  This habeas case arises from

Lee Moore's conviction in Ohio state court of aggravated murder, aggravated robbery,

and kidnapping. In cross-appeals, Warden Betty Mitchell appeals the district court order conditionally granting Lee Moore's petition based on claims of ineffective assistance of counsel at sentencing and improper jury instructions. Lee Moore appeals the denial of several other claims for relief. For the following reasons we REVERSE the district court's grant of habeas relief with respect to Moore's claims of ineffective assistance of counsel at sentencing and improper jury instructions and **AFFIRM** the district court's denial of habeas relief with respect to all other claims.

## FACTS

The Ohio Supreme Court summarized the facts of the case as follows:

> On the evening of January 14, 1994, defendant-appellant, Lee Edward Moore, Jr., and Jason Holmes abducted Melvin Olinger at gunpoint and forced him into the trunk of his blue Ford Taurus. Moore drove Olinger's car to Mt. Healthy, dropped Holmes off, and picked up Larry Kinley. The two drove Olinger's car to a factory area in Cincinnati, where Moore ordered Olinger out of the trunk, robbed him of his wallet, and shot him in the head, killing him. Moore later admitted committing the crimes but claimed that the shooting was accidental. Moore was subsequently convicted of aggravated murder, kidnapping, and aggravated robbery, and sentenced to death.
>
> On January 14, at approximately 7:20 p.m., Melvin Olinger, a suburban Chicago businessman, visited his parents in Fairfield. Olinger then went to a funeral home during calling hours for a friend who had passed away. Later, he went to Gina's, a bar, around 9:00 to 9:30 p.m., where he talked with Charlotte James. He told her that he was going to visit his mother that evening before returning to Chicago the next day. Olinger stayed in the bar for about fifteen minutes.
>
> That same evening, Moore and Jason Holmes drove to Fairfield, intending to steal a car. Moore waited outside Gina's and saw Olinger get out of his blue Ford Taurus and enter the bar. When Olinger returned to his car, Moore confronted him with a gun and told Olinger to get in. Moore drove the Taurus to the rear of the bar and forced Olinger to climb into the trunk. Moore drove the Taurus to Larry Kinley's house in Mt. Healthy while Holmes followed in Moore's Ford Fairmont.
>
> Moore and Kinley drove to a store in the Taurus, leaving Holmes behind to babysit. Moore told Kinley how he had stolen the car and that he was going to get it painted and modified. Moore told Kinley that he was driving to the Cumminsville area of Cincinnati to show the car to a friend. Instead, Moore drove to a factory area at 3366 Llewellyn Street. On the way, Moore told Kinley that he was going to kill the man in the

trunk. When Kinley asked Moore why he was going to kill the man, Moore responded, "This ain't nothing. . . . We're not going to get caught for it."

Upon driving into the factory area, Moore headed toward a dumpster. He stopped the car and let Olinger out of the trunk while Kinley remained in the car. Kinley testified that he didn't see what happened because the trunk lid was up, but that he heard Moore tell Olinger to empty his pockets. Kinley testified that Moore directed Olinger to the corner by the dumpster and that he heard Olinger beg and plead to Moore about Olinger's sick mother.

Kinley heard a gunshot, then Moore jumped into the car. According to Kinley, Moore laughed and asked him, "Did you see his dome get shot off?" After leaving the scene, Moore directed Kinley to take the credit cards out of Olinger's wallet. Kinley said that Moore sounded upset because he had forgotten to ask Olinger for the personal identification number to his Jeanie card.

In a taped statement to police, Moore claimed that he asked Olinger for his wallet after directing him to the dumpster. When Olinger dropped the wallet and stepped forward, Moore said that he panicked and "accidentally pulled the trigger. But it was an accident. . . . I had a large amount of drinks an' . . . some marijuana. An' it truly truly was an accident."

Moore and Kinley returned to Kinley's house, where Moore told Holmes what had happened. Moore told Holmes that he planned to keep the Taurus and that Holmes could use his Fairmont any time he wanted. At Moore's request Kinley took the Michigan plates off Olinger's Taurus. Kinley then took one of the plates off Moore's Fairmont and put it on the Taurus.

The next day, Moore and Kinley went out to get "some stuff." Moore used Olinger's credit card to purchase over $1,000 worth of clothing and jewelry at two J.C. Penney stores in the Cincinnati area. A sales clerk became suspicious and contacted Penney's loss prevention officer. The officer observed two black males place their purchases in the trunk of a blue Ford Taurus with Ohio tags and drive away.

At approximately 5:30 p.m. on January 20, police apprehended Moore and Kinley as they waited for an order in the drive-through lane of a McDonald's restaurant. Moore was placed in a holding cell at the Mt. Healthy police station. Officers confiscated several items of clothing from Moore which were believed to have been purchased with Olinger's credit card. Shortly after midnight, Moore was advised of his Miranda rights and signed a waiver of rights form.

Moore was then taken to the downtown Cincinnati police station for questioning. Although the weather was cold and snowy, Moore was required to walk a short distance to and from the police car in his stocking feet, since his shoes had been confiscated as evidence. At

approximately 6:30 a.m., while "crying a little bit" and sniffling, Moore admitted to police that he had robbed and kidnapped Olinger and that he had shot and killed Olinger. He claimed that the shooting was accidental.

Based on information supplied by Kinley, police located Olinger's body. The chief deputy coroner determined that Olinger had died of a single gunshot wound to the head fired from a distance of between six and twenty-four inches away.

The grand jury indicted Moore on three counts of aggravated murder, one count of aggravated robbery, and one count of kidnapping. All counts carried a firearm specification. All three aggravated murder counts carried three death-penalty specifications: (1) aggravated murder to escape detection for kidnapping and/or aggravated robbery (R.C. 2929.04[A][3]); (2) aggravated murder committed in connection with kidnapping where Moore either was the principal offender or committed the aggravated murder with prior calculation and design (R.C. 2929.04[A][7]); and (3) aggravated murder committed in connection with aggravated robbery where Moore either was the principal offender or committed the aggravated murder with prior calculation and design (R.C. 2929.04[A][7]).

The defense essentially admitted Moore's involvement in the crimes. It argued that Moore had not formed the specific intent to kill Olinger. After deliberation, the jury found Moore guilty as charged.

Prior to the mitigation hearing, the trial court merged the three death specifications of Count I (aggravated murder committed with prior calculation and design) into one specification: murder to escape detection for kidnapping and/or aggravated robbery. The court also merged the two felony murder counts into one count and merged the three specifications attached to these counts into two: murder during kidnapping and murder during aggravated robbery.

During the mitigation hearing, several witnesses testified on Moore's behalf, and Moore gave a remorseful unsworn statement admitting the wrongfulness of his actions.

The jury recommended death, and the court imposed the death penalty. The court also imposed consecutive prison sentences for Moore's other convictions. Upon appeal, the court of appeals affirmed the convictions and sentence of death.

*State v. Moore*, 689 N.E.2d 1, 5–7 (Ohio 1998).

## PROCEDURAL HISTORY

Moore was tried and convicted in 1994. The Ohio Court of Appeals affirmed his conviction and sentences in June 1996, *State v. Moore*, No. C-950009, 1996 WL 348193 (Ohio Ct. App. Jun. 26, 1996), and the Ohio Supreme Court affirmed in February 1998,

*State v. Moore*, 689 N.E.2d 1 (Ohio 1998).  While his first appeal was pending, Moore filed a petition for post-conviction relief in the trial court.  The trial court denied the petition, and the Ohio Court of Appeals affirmed that decision in September 1998.  *State v. Moore*, No. C-970353, 1998 WL 638353 (Ohio Ct. App. Sept. 18, 1998).  The Ohio Supreme Court denied review in 1999.  *State v. Moore*, 704 N.E.2d 579 (1999) (table).  Moore applied to reopen his appeal under Ohio App. R. 26(B)[1] in September 2000.  The Ohio Court of Appeals denied the application as untimely and on the basis of res judicata.  The Ohio Supreme Court affirmed that decision, holding that Moore failed to raise a genuine issue as to whether he was deprived of the effective assistance of counsel on appeal.  *State v. Moore*, 758 N.E.2d 1130, 1133 (Ohio 2001).

Moore filed his petition for a writ of habeas corpus in June 2000.  He raised twenty-five claims.  After a period of discovery, the magistrate judge recommended granting the petition in part and denying it in part.  Both the Warden and Moore filed objections.  The magistrate judge filed a supplemental report and recommendation ("R&R"), and the parties again filed objections.  The district court adopted the magistrate judge's R&R in part and rejected it in part.  The district court granted relief on Claim (2)(B), one of Moore's claims of ineffective assistance of counsel at sentencing, and on Claims (6) and (16), his claims of improper jury instructions in the penalty phase.  *Moore v. Mitchell*, 531 F. Supp. 2d 845, 921–22 (S.D. Ohio 2008).  Moore applied for a certificate of appealability ("COA") as to ten claims and subclaims.  The magistrate judge recommended granting Moore a COA as to seven of those claims and subclaims, and the parties filed objections.  The district court adopted the magistrate judge's R&R in part and modified it in part, issuing Moore a COA as to eleven claims and subclaims.  This court granted Moore's application to expand the COA to include two additional claims.

Moore did not brief his claims concerning erroneous mitigation instructions (Claim (16)) or erroneous guilt phase instructions (Claim (21)(A)) on appeal, and thus

---

[1]Rule 26(B) is a state remedy that allows a defendant to reopen his direct appeal if he was harmed by ineffective assistance of appellate counsel.  Ohio App. R. 26(B).  A case reopened pursuant to this rule is also known as a "Murnahan" appeal.  *See State v. Murnahan*, 584 N.E.2d 1204 (Ohio 1992).

has waived review of them.  *See* Fed. R. App. P. 28(a)(9)(A); *Landrum v. Mitchell*, 625 F.3d 905, 913 (6th Cir. 2010).

### STANDARD OF REVIEW

This court reviews de novo a district court's legal conclusions and mixed questions of law and fact and reviews its factual findings for clear error.  *Armstrong v. Morgan*, 372 F.3d 778, 781 (6th Cir. 2004); *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999).  Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court shall not grant a habeas petition with respect to any claim that was adjudicated on the merits in the state courts unless the adjudication resulted in a decision that:  (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented to the state courts.  28 U.S.C. § 2254(d).  Under the contrary to clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).  Under the unreasonable application clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case.  *Id.* To obtain habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington v. Richter*, 131 S. Ct. 770, 786–87 (2011).

To analyze whether a state court decision is contrary to or an unreasonable application of clearly established Supreme Court precedent, courts look only to the holdings of the Supreme Court's decisions as of the time of the relevant state court decision.  *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003).  Courts consider lower court decisions to the extent they shed light on the analysis of Supreme Court holdings to determine whether a legal principle had been clearly established.  *Hill v. Hofbauer*,

337 F.3d 706, 716 (6th Cir. 2003).   Finally, the state court's factual findings are presumed correct unless rebutted by the habeas petitioner by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1); *McAdoo v. Elo*, 365 F.3d 487, 493–94 (6th Cir. 2004).

**Claim (1)**

Moore alleges that his mitigation specialist, Charles Stidham, had an undisclosed actual conflict of interest because he simultaneously represented Moore's accomplice, Jason Holmes, in Holmes's appeal from his convictions involving the same crimes. Holmes was tried separately from Moore and was convicted of aggravated murder, aggravated robbery, and kidnapping with specifications. *State v. Holmes*, No. C-940385, 1995 WL 229063 (Ohio Ct. App. Apr. 19, 1995).

The district court held that Moore procedurally defaulted this claim because he did not raise it on direct appeal or post-conviction relief. *Moore*, 531 F. Supp. 2d at 863. In his Rule 26(B) application, he claimed ineffective assistance of appellate counsel for failing to raise the claim.  The Ohio Court of Appeals denied that claim and the Ohio Supreme Court affirmed. *Moore*, 758 N.E.2d at 1132–33.

Whether a petitioner's federal habeas claim is barred by procedural default is a question of law reviewed de novo. *Abela v. Martin*, 380 F.3d 915, 922 (6th Cir. 2004).

The district court properly held that Moore procedurally defaulted this claim. "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  When a petitioner has failed to present the grounds of his claim to the state courts and has exhausted his grounds because no state remedy remains available, his grounds are procedurally defaulted. *Id.* at 847–48.  The prisoner will not be allowed to present claims never before presented in the state courts unless he can show cause to excuse his failure to present the claims and actual prejudice to his defense at trial or on appeal. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  The only exception is if review is needed to

prevent a fundamental miscarriage of justice, such as when the petitioner submits new evidence showing that a constitutional violation has probably resulted in a conviction of one who is actually innocent. *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986).

Moore did not raise this claim on direct appeal or in his post-conviction petition, and he has no state remedies available. Ohio law permits second, successive, or untimely petitions only under limited circumstances. Ohio Rev. Code § 2953.23. Successive post-conviction relief petitions are barred unless the petitioner was unavoidably prevented from discovering the facts on which he later seeks to rely in a successive petition, or the United States Supreme Court has recognized a new right that applies retroactively to the petitioner. In addition, the prisoner must show that, but for the error, no reasonable fact-finder would have found him guilty, or, in a death penalty case, eligible for the death sentence. Ohio Rev. Code § 2953.23(A)(1); *Broom v. Mitchell*, 441 F.3d 392, 400 (6th Cir. 2006). Moore's conflict of interest claim does not meet these requirements because his claim does not rely on a new right recognized by the Supreme Court, and he does not allege that Stidham's alleged conflict of interest affected his eligibility for the death sentence. Accordingly, Moore could not raise this claim in a successive post-conviction petition, and the claim is defaulted. *See O'Sullivan*, 526 U.S. at 848.[2]

Moore argues that cause and prejudice excuse this procedural default. *Carrier*, 477 U.S. at 495–96. Cause may exist if his appellate counsel was ineffective in failing to raise the issue. *Id.* at 492; *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004). "Ineffective assistance under *Strickland* [*v. Washington*, 466 U.S. 668 (1984),] is deficient performance by counsel resulting in prejudice, with performance being measured against an objective standard of reasonableness under prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (citations and internal quotation marks omitted). In the appellate context, "To establish deficient performance, [petitioner] must demonstrate his appellate counsel made an objectively unreasonable

---

[2]Moore does not advance this argument concerning procedural default and second or successive state petitions for any claims. We note that the argument does not apply to any of his other claims, negating the need to mention it again in this opinion.

decision by choosing to raise other issues instead of [the challenged issue], meaning that issue 'was clearly stronger than issues that counsel did present.'" *Webb v. Mitchell*, 586 F.3d 383, 399 (6th Cir. 2009) (quoting *Smith v. Robbins*, 528 U.S. 259, 285, 288 (2000)). To show prejudice, Moore must demonstrate "'a reasonable probability that, but for his counsel's unreasonable failure to' raise this issue on appeal, 'he would have prevailed.'" *Id.* (quoting *Robbins*, 528 U.S. at 285). But, taking a step back, a petitioner cannot show that appellate counsel was ineffective for failing to raise a claim on appeal if the underlying claim itself lacks merit. *Davie v. Mitchell*, 547 F.3d 297, 312 (6th Cir. 2008).

Moore urges us to review the Ohio Supreme Court's decision de novo because the state court's decision was so brief and "summary." However, we still accord the state court's decision the appropriate deference under AEDPA. In *Harrington v. Richter*, 131 S. Ct. 770 (2011), the Supreme Court recently clarified that even summary decisions by state courts are entitled to the AEDPA standard of review under § 2254(d). "There is no merit to the assertion that compliance with § 2254(d) should be excused when state courts issue summary rulings." *Id.* at 784. Summary rulings on the merits do not receive de novo review. *Id.* at 786. Though the state court's *reasons* may not be clear, "[u]nder § 2254(d), a habeas court must determine what arguments or theories supported or . . . could have supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Id.*

Showing proper deference to the state court's decision in Moore's Rule 26(B) application, we conclude that the state court did not unreasonably apply *Strickland* because the underlying claim—a mitigation expert's conflict of interest—is meritless. A claim that an attorney had a conflict of interest is analyzed under a modified version of the two-part *Strickland* test for ineffective assistance of counsel. *See Strickland*, 466 U.S. at 692 (citing *Cuyler v. Sullivan*, 446 U.S. 335, 345–50 (1980)). The defendant must show that his attorney performed deficiently by demonstrating that the attorney actively represented conflicting interests. *Id.* An actual conflict of interest is one that

adversely affects counsel's performance. *Mickens v. Taylor*, 535 U.S. 162, 171 n.5 (2002). For example, if counsel fails to pursue an obvious defense that would have inculpated counsel's other client and there is no benefit from foregoing the defense or other explanation, the defendant has presented evidence of his counsel's conflict of interest. *See McFarland*, 356 F.3d at 707. If the defendant shows an actual conflict of interest, prejudice to his defense is presumed. *See Strickland*, 466 U.S. at 692.

First, it is not clear that Stidham was even serving as counsel as that term is used in the Sixth Amendment. Though an attorney by trade, Stidham appears to have been employed by Moore's attorneys, Daniel James and Timothy Deardorff, as a mitigation specialist. The right to conflict-free representation stems from the Sixth Amendment's guarantee of effective assistance of counsel. *Mickens*, 535 U.S. at 166. Since there is no constitutional right to a mitigation specialist, *see Jells v. Mitchell*, 538 F.3d 478, 495 (6th Cir. 2008), much less an effective one, there is no constitutional right to a specialist free of conflicts.

Even if we assume that Stidham served as Moore's counsel, Moore does not point to any evidence that Stidham's work with Holmes prejudiced him. Moore basically argues that because he was representing both, there *must* have been harm done to him, and thus an actual conflict. This reasoning is flawed. We do not find *per se* conflicts. We look for actual conflicts:

> To find an actual conflict, we require petitioner to point to specific instances in the record to suggest an actual conflict or impairment of [his] interests and demonstrate that the attorney made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other.

*McElrath v. Simpson*, 595 F.3d 624, 631 (6th Cir. 2010) (internal quotation marks omitted). Moore does not point to any such instances. Here, Moore and Holmes were tried at separate trials, before separate juries. There is no evidence that Stidham did anything for Holmes on appeal to the detriment of Moore. Moore does not explain what additional mitigation evidence should have been presented, but for the alleged conflict of interest. Moore cannot show ineffective assistance of his appellate counsel for failing

to raise the issue on appeal because the underlying claim lacks merit. *Davie*, 547 F.3d at 312. The state court did not unreasonably apply *Strickland* in so holding. The claim is procedurally defaulted and that default is unexcused.

**Claims (2)(A), (B), and (C)**

**Claim (2)(A)**

Moore claims that his trial counsel, attorneys James and Deardorff, were constitutionally ineffective for their decision to employ the mitigation specialist, Stidham, who, according to Moore, failed to adequately assist in preparation for the mitigation phase of his trial. Moore raised one ineffective assistance claim on direct appeal before the Ohio Supreme Court (Claim (2)(B)), but he did not raise this specific claim. Moore also raised other claims in his state postconviction petition but—again—not this one. In his Rule 26(B) application before the state court, he alleged ineffective assistance of appellate counsel for failing to raise this claim on direct appeal. The state court rejected the claim. The district court also denied relief on the claim.

Moore has procedurally defaulted Claim (2)(A). Here, Moore was represented by Timothy Deardorff both at trial and on direct appeal before the Ohio Court of Appeals. Normally, counsel are not expected to raise the issue of their own ineffectiveness; failure to do so will not bar the claim because of res judicata. *See State v. Lentz*, 639 N.E.2d 784, 785–86 (Ohio 1994) ("[S]ince counsel cannot realistically be expected to argue his own incompetence, *res judicata* does not act to bar a defendant represented by the same counsel at trial and upon direct appeal from raising a claim of ineffective assistance of counsel in a petition for postconviction relief." (citation and internal quotation marks omitted)). However, Moore was represented by different counsel before the Ohio Supreme Court (where he brought another, different ineffective assistance claim) and throughout his state postconviction proceedings. Because Moore did not raise this claim at those opportunities, he has procedurally defaulted it.

Moore urges us to find cause because his appellate counsel was ineffective for failing to raise this ineffective assistance of trial counsel claim on direct appeal. He alleged this in his Rule 26(B) application, but the state court denied it. Because the state court ruled on this matter on the merits, its decision is entitled to AEDPA deference. *See* § 2254(d)(1).

In order to assess the claim of ineffective assistance of appellate counsel as an excuse for defaulting the underlying claim, we may look to the strength of the underlying claim. *Davie*, 547 F.3d at 312. We agree with the district court that this claim has no merit. Moore cannot show he was prejudiced by his counsel's use of Stidham as a mitigation specialist because he has never identified any new mitigation evidence that Stidham should have aided in discovering. *See Sears v. Upton*, 130 S. Ct. 3259, 3266 (2010).

We affirm the district court in denying relief because Moore has procedurally defaulted Claim (2)(A). That procedural default is not excused because even if his appellate counsel had raised the issue, the underlying claim was meritless.

**Claim (2)(B)**

Moore claims that trial counsel was ineffective at mitigation because Moore's expert witness gave damaging testimony during cross examination. Moore argues that this would not have happened if trial counsel been prepared and known how the expert was going to testify.

**Facts**

At the penalty phase, the defense put on the stand its expert witness, Dr. David Chiappone, a psychologist. As the prosecutor questioned him on cross-examination, the following exchange took place:

> Q. Dr. Chiappone, you reviewed all these tests, all these records. And again, you're still trying to find why Lee Moore did what he did. Did you ever ask him why he killed Melvin Olinger?
>
> A. Yes, I did.

Q.  What did he tell you?

A.  Well, what struck me is he had a difficult time explaining it, if you will.  I asked him several times.  It's almost like he didn't know what to do.  He said he wasn't sure what to do.  He said he was afraid the man would identify him.

Q.  So he shot him so he would not be identified?

A.  That's the implication—[objection overruled].

Q.  Doctor, are you familiar with the previous statement that Lee Moore gave to the police, wherein he claimed this was all an accident?

A.  Yes, I am aware of that.

Q.  Did you specifically confront Lee Moore with that and ask him whether or not this was an accident when he shot Melvin Olinger?

A.  I'm not sure if he used the word accident, but I did confront him about the information regarding his report to the police officers.

Q.  About the way he characterized it to the police?

A.  Correct.

Q.  What was your memory of how he characterized it at the time?

A.  *Well, he told me that he made that up when he talked to the police, because he wanted to make it look like it was an accident.*

Q.  So when he gave that statement to the police about dropping the wallet and the gun just went off and it was an accident, he told you that he made that up?

A.  That is correct.

(Emphasis added.)  On redirect, Moore's counsel tried to rehabilitate Dr. Chiappone's testimony:

Q.  Now, Doctor, when you talked to Mr. Moore, do you remember that he told you—that he indicated that the man dropped the wallet, but that's the part of the statement that he made up to the police, that the man actually did not drop the wallet, that he claimed that he did?  Is that correct?

A.  Yes.

On direct appeal, proceeding with different counsel before the Ohio Supreme Court, Moore raised the claim that his trial counsel did not prepare adequately based on this exchange. There was no evidence before the state court other than the trial transcript. The court denied his claim, finding that Moore had failed to show deficient performance and failed to show prejudice. *Moore*, 689 N.E.2d at 14–15. On state post-conviction relief, Moore asked for an evidentiary hearing and/or discovery, but the court denied his request and denied relief. *See Moore*, No. C-970353, 1998 WL 638353 at *3–4.

The district court granted Moore's motion for discovery but denied his motion for an evidentiary hearing. In discovery, Moore took the depositions of trial attorneys James and Deardorff, mitigation specialist Stidham, and psychologist Dr. Chiappone, among others. The district court granted the joint motion of the parties to expand the record to include these depositions as well as the files of James, Deardorff, and Stidham. The district court granted relief on Claim (2)(B). *Moore*, 531 F. Supp. 2d at 870.

**Evidence before the federal habeas court**

Initially, we note that because of a recent Supreme Court case, we must conclude that neither the district court nor this court may consider the additional evidence introduced in federal court. In *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), the Court held that review under § 2254(d)(1)[3] is limited to the record before the state court when it ruled on the merits. *Id.* at 1398. The Court held that this does not render meaningless

---

[3]Section 2254(d) of AEDPA states:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

the provisions of § 2254(e)(2).[4]  *Id.* at 1400–01.   According to the Court, those provisions, which address when a petitioner is entitled to an evidentiary hearing, are limited to cases where the underlying claim on habeas was not adjudicated on the merits by the state court.  *Id.*

Moore's case presents a slightly different factual wrinkle.  While the State originally opposed Moore's motions for discovery, it moved jointly with Moore to admit the fruits of discovery into the record.  Thus we are faced with the novel question stemming from *Pinholster*:  May a federal habeas court consider additional evidence not before the state courts, despite the prohibition *Pinholster* found in § 2254(d)(1), when the parties jointly move to expand the record?  In a supplemental brief filed after *Pinholster* was decided, Moore contends that a federal habeas court may consider such evidence under these circumstances.  We hold that it may not.

In *Miller-El v. Dretke*, 545 U.S. 231 (2005), the Court flirted with addressing whether parties could jointly agree to expand the record with additional evidence for the court's consideration of the merits of the claims where § 2254(d)(2) was applicable.[5] In that case, the petitioner raised a *Batson* challenge in his habeas petition.  Among other evidence, the Court considered juror questionnaires and juror information cards.  *Id.* at 256–260.  Apparently, these were added to the habeas record after petitioner's initial filing in a "joint lodging."  *Id.* at 257 n.15.  The Court indicated that the State did not object to the juror questionnaires in the district court or the Fifth Circuit, and most of the State's arguments before the Supreme Court relied upon the questionnaires, urging the

---

[4]Section 2254(e)(2) of AEDPA states:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that the claim relies on . . . a factual predicate that could not have been previously discovered through the exercise of due diligence and the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2) (subsection numbers and some punctuation omitted).

[5]As *Pinholster* made clear, § 2254(d)(1) and (d)(2) are identical in their restrictions, so we find that any discussion of (d)(2) helps inform our understanding of the parallel provisions of (d)(1). *See Pinholster*, 131 S. Ct. at 1400 n.7.

Court to consider them. *Id.* The Court noted that neither party referred to § 2254(d)(2) as limiting the habeas court to considering only the state court record. *Id.* But, the Court also noted that it was not clear whether the questionnaires went beyond the materials that the state court had before it. *Id.* (After all, the juror questionnaires were only generated as part of the jury selection process in the state court.) The Court held that it need not determine whether the strictures of § 2254(d)(2) are waivable. *Id.*

The Supreme Court has given plenty of indication that the restrictions of AEDPA are strong and binding on federal courts. These restrictions have all the hallmarks of a jurisdictional limitation on the power of the federal courts themselves. In *Harrington*, the Court stated that "Section 2254(d) is part of the basic structure of federal habeas *jurisdiction*, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions." 131 S. Ct. at 787 (emphasis added). AEDPA has "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). This modification of the courts' role is binding on the courts themselves: "Under AEDPA, Congress *prohibited federal courts* from granting habeas relief unless a state court's adjudication of a claim 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (emphasis added) (quoting § 2254(d)(1)); *see also Premo v. Moore*, 131 S. Ct. 733, 739 (2011) ("AEDPA *prohibits federal habeas relief* for any claim adjudicated on the merits in state court, unless one of the exceptions listed in § 2254(d) obtains." (emphasis added)); *Williams*, 529 U.S. at 399 (O'Connor, J., concurring) ("In [AEDPA], Congress placed a new *restriction on the power of federal courts* to grant writs of habeas corpus to state prisoners." (emphasis added)); *Eze v. Senkowski*, 321 F.3d 110, 121 (2d Cir. 2003) ("[AEDPA] contains unequivocally mandatory language."); *Lainfiesta v. Artuz*, 253 F.3d 151, 155 (2d Cir. 2001) (noting that AEDPA "significantly curtailed the power of federal courts to grant the habeas petitions of state prisoners" (italics omitted)).

*Pinholster* itself emphasized the binding nature of AEDPA as a restriction on the courts themselves: "[AEPDA] sets several limits on the *power of a federal court* to grant an application for a writ of habeas corpus on behalf of a state prisoner." 131 S. Ct. at 1398 (emphasis added). Congress's intent in AEDPA was "to channel prisoners' claims first to the state courts." *Id.* at 1398–99. *Pinholster*'s holding was unequivocal: "We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.* at 1398.

Furthermore, at least one circuit has held that the deferential standard of review under § 2254(d) is not waivable. *See Eze*, 321 F.3d at 121 (holding that AEDPA standard of review under § 2254(d)(1) was not waivable).

This court has previously discussed in dicta waivability of AEDPA's requirements, specifically with regard to § 2254(e)(2). In *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007), the district court had relied on new evidence introduced into the federal record in ruling on petitioner's ineffective assistance of counsel claim. *Id.* at 351–52. We speculated as to whether the state had implicitly waived the requirement that the habeas court be confined to the state court record. *Id.* at 351–55. We noted that the state urged the district court to consider the evidence and had itself suggested that evidence be added via expansion of the record rather than an evidentiary hearing. Although we discussed "waiver" of the requirements of § 2254(e)(2), that discussion was unnecessary to our decision because the district court had explicitly held that "[Petitioner] did attempt to develop the factual basis for his claims in state court." *Id.* at 352. This meant that Petitioner had met the requirements of § 2254(e)(2) and additional evidence therefore could be considered by the federal habeas court. The state never challenged that part of the district court's holding on appeal. *Id.* The state had not waived the requirements of § 2254(e)(2), but it waived any argument contesting the district court's factual findings concerning § 2254(e)(2) by not raising any such argument on appeal.[6]

---

[6]To avoid any confusion, we also note that *Richey*'s holding may very well stand, even in light of *Pinholster*. *Richey* appears to operate under the mistaken notion that a petitioner is entitled to an evidentiary hearing and/or additional evidence in federal habeas court so long as he was diligent in attempting to develop the record in accordance with § 2254(e)(2), regardless of whether or not the state

Even if AEDPA were not jurisdictional, our conclusion would be the same in this case because it is well established that parties may not stipulate to a standard of review. *See Reg'l Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 712 n.10 (6th Cir. 2006). In this circuit, when we have held that new evidence was properly introduced in the federal habeas court, we have applied de novo review to those relevant claims adjudicated on the merits in state court. *See Brown v. Smith*, 551 F.3d 424, 429 (6th Cir. 2008). We have held that de novo review would be appropriate in these cases because it would be impossible and even nonsensical to determine if a state court unreasonably applied clearly established law to facts it did not have before it. *Id.*; *see also Holland v. Jackson*, 542 U.S. 649, 653 (2004) (noting this approach without endorsing it); *cf. Pinholster*, 131 S. Ct. at 1399 n.3 ("What makes the consideration of new evidence strange is . . . the notion that a state court can be deemed to have unreasonably applied federal law to evidence it did not even know existed."). Here, by agreeing to look at evidence beyond the state record we would be permitting the parties to declare their own standard of review. Permitting that does violence to both the evidentiary restrictions of AEDPA and the principle that parties are not free to dictate this court's standard of review. Besides, this method of reaching de novo review, assumed in *Holland*, was flatly rejected in *Pinholster*. *See* 131 S. Ct. at 1400 ("Today, we reject that assumption and hold that evidence introduced in federal court has no bearing on § 2254(d)(1) review.").[7]

In any event, the Warden has not waived any objection to consideration of an expanded habeas record. Moore's argument is that by jointly moving to expand the

---

court ruled on the merits of his claims. This understanding was of course rejected in *Pinholster*. However, in an alternative holding, *Richey* held that parts of the ineffective assistance of counsel claims were not procedurally defaulted and never ruled on by the state court. 498 F.3d at 359–60. Though not explicitly stated in the court's opinion, § 2254(d)(1) probably did not apply because it appears that no state court ever adjudicated the claim on the merits. *Richey*'s outcome remains consistent with *Pinholster*.

[7] In a supplemental brief we permitted him to file on the effect of *Pinholster* on his claim, Moore argues that, even if *Pinholster* bans considering new evidence to initially weigh a state court's resolution of a claim, once this court finds that resolution wanting, it may then consider the new evidence. But even assuming the correctness of his argument, it would depend on our concluding that, in fact, the state court's resolution was wanting. *See, e.g.*, *Detrich v. Ryan*, 677 F.3d 958, 972 (9th Cir. 2012) ("[I]f we make an antecedent determination—relying solely on evidence before the state court—that the state court's adjudication" violated federal law under AEDPA, *then* "we . . . may . . . consider evidence that was properly presented for the first time in federal court."). And, as explained below, that is not what we conclude.

record with new evidence obtained through discovery, the State has implicitly waived the strictures of § 2254(d)(1). Obviously, there has been no express waiver.[8] And this is not a case where the State did not object to discovery at all or where the State itself relies on new evidence obtained in discovery to bolster its case. On the contrary, the State generally opposed all of Moore's attempts to collect new evidence. First, Moore made several motions, renewed motions, and amended motions for discovery, each of which the Warden opposed, each of which the court denied. After those false starts, Moore again moved for discovery; Moore filed a corrected motion; the Warden opposed the motion; Moore replied to the response; and the court granted in part and denied in part Moore's motion for discovery. Moore objected to the magistrate's denial in part of his motion and the district judge overruled his objection. Moore then moved for an evidentiary hearing; the Warden opposed it; Moore responded; the magistrate denied the motion; the district judge overruled the objection to the denial. The parties then jointly moved to expand the record with the newly taken depositions from discovery.[9] In its briefs before the district court, the Warden argued that the district court should not consider the new depositions.

We decline to find that the State waived this argument where it opposed the admission of additional evidence and all consideration of it at every turn before the district court, with the exception of one instance in which it cooperated with Moore to move the court to expand the record with the evidence. Since the court had already approved of the scope and nature of discovery, the state could have reasonably concluded that further opposition was futile.

---

[8] At least one other circuit has found that even if § 2254(e)(2) were waivable, the respondents could not be deemed to have waived the restrictions implicitly. In *McGehee v. Norris*, 588 F.3d 1185, 1194 (8th Cir. 2009), addressing § 2254(e)(2), the Eighth Circuit held that the district court improperly considered evidence outside of the state court record. The state did not object to the district court's consideration of additional evidence, but neither did it expressly waive the restrictions to the state court record. The Eight Circuit held that, if waivable, the state had not waived § 2254(e)(2). In *Williams v. Norris*, 576 F.3d 850, 860 (8th Cir. 2009), the Eighth Circuit also rejected an argument that the state waived any objection to § 2254(e)(2) by not objecting to petitioner's motion for an evidentiary hearing in the district court.

[9] Habeas Rule 7(a) addresses the expansion of the habeas record once a petition for discovery has been granted. It states: "If the petition is not dismissed, the judge may direct the parties to expand the record by submitting additional materials relating to the petition. The judge may require that these materials be authenticated." Much later, the parties also stipulated to expanding the record with the juror questionnaires. For discussion on that issue, see our analysis of Claim (13)(D) *infra*.

In any event, expansion of the record does not necessarily require that the district court consider that evidence in evaluating the merits of the habeas claim.[10] Expansion of the record can assist the district court in deciding other issues besides the merits of the claim. Habeas Rule 7, 2004 amendment note ("[A] court may wish to expand the record in order to assist it in deciding an issue other than the merits of the petition."). For example, it can sometimes be necessary to see if a petitioner has met the diligence requirement of § 2254(e)(2) for claims not adjudicated on the merits by the state court. *See, e.g.*, *Boyko v. Parke*, 259 F.3d 781, 789–90 (7th Cir. 2001).

We hold that *Pinholster* is applicable to this case because the requirements of § 2254(d)(1) are not waivable. We may not consider additional evidence not presented to the state courts on this claim.[11]

After oral argument, Moore moved to file supplemental briefing on the effect that the just-decided *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), had on his ineffective assistance of trial counsel claims. We granted his motion. In his supplemental brief, Moore stipulates that *Martinez* is only relevant if we decide *Pinholster* prevents admitting his new evidence. But if we so rule, he argues, then we must remand the case to the district court to allow factual development of his claim that his trial counsel was ineffective, and that *Martinez* mandates we do this because his *collateral* counsel was insufficiently diligent in developing that record in state court. Moore is wrong for at least two reasons.

First, *Martinez* is inapplicable to his case. In *Martinez*, the Supreme Court "narrow[ly]" answered a "precise question": "whether ineffective assistance in an initial-review collateral proceeding on a claim of ineffective assistance at trial may

---

[10]Indeed, in this case, the district court did not seem to rely on the new evidence in rendering its decision. Even if we were to consider the improperly introduced evidence, we find that it does not help establish ineffective assistance. If anything, it shows that counsel took steps to prepare for mitigation including meeting with Dr. Chiappone prior to his testifying.

[11]To the extent the dissent references material from the newly admitted depositions in the federal habeas proceedings, we note that because *Pinholster* precludes us from considering such material, we may not read the trial transcript through the lens of the later deposition testimony. Rather, our examination of the state court record must remain completely uninformed by the subsequent testimony introduced in the district court below.

provide cause for a procedural default in a federal habeas proceeding."  132 S. Ct. at 1315.  The Court carefully defined "initial review collateral proceeding" to mean state court proceedings that, by operation of state law, "provide the first occasion to raise a claim of ineffective assistance of counsel" because the state "barred the defendant from raising the claim on direct appeal."  *Id.* at 1315, 1320.  The Court concluded that, in that circumstance, inadequate assistance of *collateral* counsel may constitute cause to excuse the procedural default of an ineffective assistance of *trial* counsel claim, thus allowing federal courts to look past the default on habeas review and at the merits of the claim. *Id.* at 1320.  But the Court repeatedly emphasized the "limited nature" of its holding, which "addresse[d] only the constitutional claims" present where the state has banned a defendant from raising his ineffective assistance of trial counsel claim on direct appeal. *Id.*

We respect *Martinez*'s emphasis that its conclusion was a narrow one and join our sister circuits in refusing to expand it.  *See, e.g.*, *Ibarra v. Thaler*, 687 F.3d 222, 224 (5th Cir. 2012); *Arnold v. Dormire*, 675 F.3d 1082, 1087 (8th Cir. 2012); *Banks v. Workman*, 692 F.3d 1133, 1148 (10th Cir. 2012).  By its terms, *Martinez* does not address the type of situation that Moore presents here.  Not only does Ohio permit ineffective assistance of trial counsel claims to be made on direct appeal, Moore raised this claim on direct appeal and the Ohio Supreme Court rejected it on the merits.  *Moore*, 689 N.E.2d at 35.

Second, and relatedly, Moore is not asking that we afford a *Martinez*-like review of a procedurally defaulted claim, but rather that we turn *Martinez* into a route to circumvent *Pinholster*.  Moore's argument is not merely that *Martinez* permits us to review the merits of his claim; we already do that below, albeit through the lens of AEDPA deference, and *Martinez* is irrelevant to that analysis.  Instead, he argues that we should remand to allow *factual development* of his allegation that *collateral* counsel was ineffective, and then, if collateral counsel is found ineffective on that newly developed record, permit that record to inform his ultimate claim for relief regarding whether *trial* counsel was ineffective.  In other words, he wants this Court to grant him permission to obtain new facts to challenge the Ohio Supreme Court's rejection of his

ineffective assistance of trial counsel claim. As explained above, though, *Pinholster* plainly bans such an attempt to obtain review of the merits of claims presented in state court in light of facts that were not presented in state court. *Martinez* does not alter that conclusion.

**Deficient performance**

The district court erred in granting relief on this claim. The state court certainly did not unreasonably apply *Strickland* in reaching the conclusion that counsel's performance was not deficient.

Moore's argument is basically that trial counsel should have been aware that Dr. Chiappone was going to testify that Moore said he had lied to police. The idea is that Moore's counsel was (or should have been) pursuing a residual doubt theory[12] during mitigation, and that theory was damaged by Dr. Chiappone's testimony. Moore argues that counsel were deficient in their performance as evidenced simply by the fact that they allowed Dr. Chiappone to take the stand and testify as he did, and that the prosecutor succeeded in bringing out the damaging statements. Had counsel prepared properly and "investigated" reasonably by interviewing Dr. Chiappone in preparation for trial, they would have known what Moore had told him, and would have not called him as an expert witness, so the theory goes.

Deficient performance can be shown where counsel fail to make a reasonable investigation that they should have made. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.

Because we are limited to reviewing the evidence that was before the state court, we cannot look at the additional evidence Moore attempted to introduce in the district court and we simply have no evidence as to the preparation that Moore's counsel

---

[12]A residual doubt theory during mitigation essentially asks the jury to consider as mitigating any lingering doubt that they might still have as to the defendant's guilt. It operates in the space between certainty "beyond a reasonable doubt" and "absolute certainty." *State v. Chinn*, No. 11835, 1991 WL 289178, at *20 (Ohio Ct. App. Dec. 27, 1991). After Moore's trial, the Ohio Supreme Court repudiated it as a valid mitigation theory. *See State v. McGuire*, 686 N.E.2d 1112, 1123 (Ohio 1997).

undertook. We have only the trial transcript to look to. We do not know if Moore's counsel failed to prepare Dr. Chiappone adequately, failed to ask him what Moore had told him, or anything of the sort. Nor do we know if they undertook a thorough preparation. There is no evidence either way. The fact that Dr. Chiappone testified as he did is equally compatible with the conclusion that Dr. Chiappone actively concealed this information from trial counsel, did not remember it when trial counsel asked and only remembered on the stand, or made it up on the spot. It would be the same as a witness's blurting something out unexpectedly, with no warning, with no evidence whatsoever as to trial counsel's preparations. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985). Analogous reasoning applies when considering whether a state court based its decision "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2).

Counsel's performance is entitled to great deference and a presumption of reasonableness. *Strickland*, 466 U.S. at 689. As a sister circuit has stated, in choosing to call a witness, "[f]or counsel's [decision] to rise to the level of constitutional ineffectiveness, the decision . . . must have been completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy." *Hoxsie v. Kerby*, 108 F.3d 1239, 1246 (10th Cir. 1997) (internal quotation marks omitted).

Moore's case is similar to *Hamilton v. Workman*, 217 F. App'x 805 (10th Cir. 2007) (order denying certificate of appealability). There, the court found no ineffective assistance of counsel where counsel called an expert witness who, to counsel's surprise, gave a forensic opinion regarding a blood splatter that contradicted one of the defense's theories. *Id.* at 809. When counsel elected to call the expert as a witness, he had no knowledge that the expert's testimony would be inconsistent with defense's theory, despite having conducted adequate inquiry. *Id.*; *see also Manning v. Rogers*, 183 F. App'x 521, 525 (6th Cir. 2006) (holding state court did not unreasonably apply *Strickland* in holding that counsel was not ineffective for calling expert witness whose testimony, while helpful, was "disappointing").

Moore cites *Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000), in support of his claim. In *Combs*, the defendant pursued at the guilt phase the theory that "he was too intoxicated from alcohol and drugs to form the requisite intent to kill [the victims]." *Id.* at 273. One of the defendant's expert witnesses, a psychologist, testified on cross-examination that while the defendant was intoxicated, he nevertheless acted with intent and purpose. *Id.* This was understandably damaging to his defense. Under a pre-AEDPA standard, this court held that counsel's performance was deficient because counsel had presented the psychologist's testimony without undertaking a full investigation. *Id.* at 288. The court stated, "Regardless of whether Combs's counsel should have known or instead actually knew [the expert's] opinion regarding Combs's intent, however, counsel's decision to put him on the stand was objectively unreasonable." *Id.* The court did not discuss the investigation or preparation undertaken by the defendant's counsel; neither did it discuss any preparation of the expert witness.

Nevertheless, *Combs* is distinguishable. First, it employed a pre-AEDPA standard. *Id.* at 277 n.5. Second, the expert witness's testimony was particularly damaging because it occurred at the guilt phase, and defense's sole strategy was showing that intoxication prevented the defendant from forming the requisite intent. *Id.* at 273. "[The expert witness's] testimony directly contradicted the sole defense theory that Combs lacked the requisite intent to commit murder." *Id.* at 288. While that goes somewhat to the "prejudice" prong, it also applies to the "deficient performance" prong of *Strickland* in that it reveals how glaringly deficient counsel was. Combs's counsel called the expert witness for one purpose and the witness failed them. *Id.* Third, while the court in *Combs* did not discuss the actual preparation that trial counsel undertook, it is clear that the court had more evidence than simply the trial transcript before it, since it referenced a deposition of Comb's trial counsel. *See id.*

Here, there is no indication that Moore's counsel was relying on the residual doubt mitigation theory. Moore's trial was in 1994 and, at that time, residual doubt was a legally viable mitigation theory. After Moore's trial, the Ohio Supreme Court categorically rejected that theory in *State v. McGuire*, 686 N.E.2d 1112, 1123 (Ohio 1997). We look to the performance of Moore's counsel under the prevailing

standards at the time of trial, and residual doubt was at that time a valid mitigation theory. But while it was still a valid theory in 1994, there is no indication that it was central to Moore's mitigation case. The decision not to pursue residual doubt is a tactical matter, entitled to deference. As the Ohio Supreme Court stated,

> [T]his is a tactical matter that deserves wide latitude. The merits of arguing residual doubt to a jury which has just unanimously determined that a defendant has committed the crime beyond a reasonable doubt are dubious. When arguing for mercy for a client based upon a terrible upbringing, it was probably best for [defendant]'s counsel to avoid issues that could offend or alienate jurors.

*State v. Brooks*, 661 N.E.2d 1030, 1039 (Ohio 1996).

Indeed, there is no indication that Moore's counsel was actively pursuing residual doubt at all.[13] In the opening statement at mitigation, Moore's counsel did not foreshadow residual doubt as being a central theme of mitigation. Counsel stated, "All I can do today is show you basically two things: I can show you Lee's background. I can show you the factors that I think will convince you that maybe the death penalty is not sufficient in this matter." "[W]e're going to talk about his family background, we're going to talk about his age, and we're going to talk about other things that will play into your decision . . . ." Counsel indicated that he would focus on Moore's "history and his character and his background and his family," his "relative youth," and his "education."

Dr. Chiappone's testimony generally followed these lines. He focused on: Moore's background, the effect of his parent's divorce, the bullying he endured, substance abuse, and how well he would fit into a structured environment such as prison. There is no indication that counsel intended to use Dr. Chiappone to develop the theory of residual doubt. The rest of the mitigation case focused on family and friends, emphasizing Moore's background and his remorse.

Moore gave an unsworn statement in which he said, "I realize I must be punished for the crimes I committed, and I have no problem at all with taking responsibility for

---

[13]Although the dissent does not use the term "residual doubt theory," it claims that counsel's primary mitigation theory was essentially one of residual doubt. However, as we explain below, counsel simply did not pursue a residual doubt theory during mitigation.

my actions." However, he also said, "I want you to know that I believe I accidentally pulled that trigger."

In his closing argument, Moore's counsel stated, "Did he accidentally shoot him? That's what he said he did. I don't know if it's true, but it doesn't matter anymore. You say he didn't. . . . We're not here saying, 'Hey, wait a minute. You'd better reconsider what you did, what you said in the first phase, maybe he wasn't guilty.'" The main thrust of counsel's argument—and indeed, probably his best strategy—was the focus on Moore's taking responsibility for his actions, not trying to blame someone else, and feeling remorse. Counsel closed with the statement, "Remorse alone—remorse alone can be enough to overcome the crime he committed."

Residual doubt was simply not the focus of the mitigation phase. Nor would we expect it to be, when the jury had already found that Moore killed the victim intentionally. Counsel did not foreshadow residual doubt in his opening statement. True, Moore's unsworn statement emphasized that he still claimed he had accidentally shot the victim. But residual doubt was not the theory upon which the defense was counting until Dr. Chiappone unexpectedly undercut it.

If we truly give counsel's decisions a strong presumption of reasonableness, *Strickland*, 466 U.S. at 689, we must presume that the decision not to focus on residual doubt was a sound trial strategy. The jury had already found Moore guilty beyond a reasonable doubt of intentionally killing the victim. It was reasonable for counsel not to pursue this theory. It was reasonable for counsel to focus instead on his strongest mitigation theories: background, bullying, divorce, taking responsibility, and remorse.

Furthermore, unlike the witness in *Combs*, Dr. Chiappone did not undercut the sole reason for which counsel called him to testify. He was called to testify as to the background and mental evaluation of Moore. He offered some additional testimony on alcohol and drugs. His sole purpose was not the presentation of a residual doubt theory. Nothing else he testified to even contributed to such an argument.

On the basis of the evidence properly before us, we cannot say that the state court unreasonably concluded that Moore's counsel did not perform deficiently in their preparation for the mitigation phase.

**Prejudice**

Even if Moore could show that counsel's performance was deficient, Moore could not show "a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. The Ohio Supreme Court was charged with examining whether "there is a reasonable probability that at least one juror would have struck a different balance," *Wiggins v. Smith*, 539 U.S. 510, 537 (2003), and with reweighing the mitigation and aggravation evidence, *Strickland*, 466 U.S. at 695. We review to consider whether the Ohio Supreme Court violated or unreasonably applied clearly established federal law in its analysis. We conclude that it did not and that Moore was not prejudiced.

Dr. Chiappone's statements were indeed unfortunate and appear damaging to Moore's case. But we must not lose sight of what Dr. Chiappone actually testified to, as clarified by Moore's counsel. Moore's counsel rehabilitated Chiappone's testimony somewhat by clarifying that when Moore admitted he lied to the police, he lied about the *victim dropping his wallet*, not about the shooting being an accident. Counsel's point was to show that Moore made up the wallet-dropping (which Moore said startled him and caused him to accidentally shoot the victim point blank in the head) to support his explanation that the shooting was accidental.

The mitigation evidence in favor of Moore was not strong. Moore came from a divorced family. He was of average intelligence. By some accounts he was "spoiled" as a child. He suffered from bullying and was occasionally attacked by other neighborhood children when he was younger. But there were no accounts of parental abuse and neglect, no history of witnessing violence, no indication of low intelligence, nor evidence of any of the typical mitigation factors. And support for any theory of residual doubt was even weaker; there was ample testimony in the guilt phase indicating

that Moore acted intentionally and that the shooting was not an accident. Moore and Kinley drove to a remote location with the victim in the trunk of the victim's own car. Kinley testified that when he asked Moore why he was going to kill the victim, Moore responded, "This ain't nothing. . . . We're not going to get caught for it." *Moore*, 689 N.E.2d at 5. At the remote location, Moore got the victim out of the trunk and directed him over to a nearby dumpster. He shot him in the head. Kinley testified that Moore laughed afterwards and asked him, "Did you see his dome get shot off?" *Id.* There was nothing in Moore's post-shooting reaction consistent with his claim that the shooting was accidental. The jury had already found beyond a reasonable doubt that Moore acted intentionally. In short, there was little "residual doubt" theory to pursue, and there is virtually no probability that without the damage done to any such theory at least one juror would have voted against the death penalty.

Finally, the potential damage done by Dr. Chiappone's testimony is distinguishable from that in *Combs*. In *Combs*, the testimony was devastating because it eliminated the defense's *only* defense theory—that intoxication prevented Combs from forming intent—and it also helped establish one of the prosecution's required elements—intent. *Combs*, 205 F.3d at 288. Here, the damage was not so great because the mitigation case was weak and did not explicitly require pursuing a residual doubt theory, and the testimony was presented at sentencing, not at the guilt phase. *See also Pinholster*, 131 S. Ct. at 1411 ("Those cases [decided on a pre-AEDPA standard] offer no guidance with respect to whether a state court has *unreasonably* determined that prejudice is lacking.").

Applying the AEDPA standard of deference, we conclude that the Ohio Supreme Court was not objectively unreasonable in holding that Moore was not prejudiced.

**Claim (2)(C)**

Moore also claims that his trial counsel, Deardorff, was ineffective in the opening and closing arguments he delivered at the penalty phase. Moore raised this claim in his state post-conviction petition. The state trial court denied the petition and the Ohio Court of Appeals reviewed the claim on the merits. *See Moore*, No. C-970353, 1998

WL 638353, at *3–4. We therefore apply AEDPA deference in reviewing the state court rulings.

Moore points to statements counsel made that, taken in isolation, appear to be quite damaging or at least unhelpful. However, we do not look at such statements in isolation—we look at them in context. *United States v. Lostia*, 20 F. App'x 501, 502 (6th Cir. 2001). And, considered in context, each of the statements is clearly a part of the constitutionally sufficient defense strategy Moore's counsel adopted. Viewing them in this light, we cannot conclude that the Ohio courts unreasonably applied *Strickland*.

Fully half of the statements Moore identifies simply reflect some variant on counsel's unenviable task of reconciling the jury's guilt-phase findings—and particularly the finding that Moore had intentionally shot the victim—with Moore's position that the shooting was accidental. For instance, Moore points to counsel's statement in the closing argument that:

> But the bottom line in the first issue, or in the first phase, as Mr. Deters says, is: Did he accidently shoot him? That's what he said he did. I don't know if it's true, but it doesn't matter anymore. . . . [B]ut the bottom line—cut out all the garbage—he shot Mr. Olinger and stole his car and used his credit cards. That's the bottom line. That's what he did.

But Moore omits the language in the middle of that passage where counsel stated, "You say he didn't. All right. So I'm not going to argue with you whether that's true or not." This context makes clear that counsel was acknowledging the jury's guilty verdict they had already rendered in the guilt phase while still keeping in front of them Moore's position that the shooting was accidental.

The same is true for counsel's statement, "And I think the bottom line is Lee just doesn't want to believe that he did this. He doesn't want to accept that he did this. In his own mind, he can't believe he did it. And I think that's what he's trying to say to you today." But immediately before that, counsel also stated, "We don't know. And you say it's not accidental. But my point being is that Lee believes it was accidental. If it wasn't, then maybe somewhere along the line—because of the trauma or somewhere along the line, he's convinced himself that it was." Again, the context shows that

counsel was trying to explain why Moore persistently stated that he believed he shot the victim accidentally even after the jury's verdict had declared otherwise.

Similarly, Moore points to several statements his counsel made about life imprisonment, but, when considered in context, they demonstrate that counsel was urging the jury to reject the death penalty. For example, Moore calls our attention to counsel's comments that "I know I wouldn't want to go to jail for seventy-three years. . . . I'd rather you put me to death." However, counsel followed that up and asked, "How much punishment do we have to give someone?" While not an ideal formulation for the point he was making, this and other contexts show that counsel was not suggesting that the jury sentence Moore to death, but rather was emphasizing the severity of a life sentence and that the jury would not be letting Moore off lightly if they sentenced him to a prison term.

All of the other alleged ills Moore identifies with his counsel's opening and closing arguments are likewise cured by context. As a result, Moore can show neither deficient performance nor prejudice in this claim.

By way of contrast, Deardorff's argument did not approach that of the defense attorney in *Rickman v. Bell*, 131 F.3d 1150 (6th Cir. 1997), where this Court did find prejudice. In *Rickman*, defendant's counsel pursued a strategy of attempting to portray his client as a "sick" and "twisted" individual, which would mitigate against a death sentence. *Id.* at 1157–59. Counsel repeatedly attacked his client's character, elicited damaging character evidence about him, made disparaging comments to any witness who spoke favorably about him, and apologized to the prosecutors for his client's crime. *Id.* We concluded that counsel's performance was "outrageous," as his attacks on Rickman equaled or exceeded those made by the prosecution. *Id.* at 1156-60. We presumed prejudice and granted the writ. *Id.* at 1160.

In Moore's case, counsel put on a defense in the guilt phase, presented lay and expert testimony in the penalty phase, and argued to the jury that there were mitigating factors in Moore's background and the circumstances of the crime. Arguments made in mitigation included Moore's age, his acceptance of responsibility, his remorse, the role

of drugs and alcohol, the fact that his codefendants could not be sentenced to death, the morality of the death penalty, and the fact that if given a life sentence Moore would not be released for a very long time. Although Deardorff acknowledged—as he had to, particularly given his sentencing strategy—the jury's guilt-phase verdict, he clearly did not portray Moore negatively. *See also Goodwin v. Johnson*, 632 F.3d 301, 309–12 (6th Cir. 2011) (trial counsel not ineffective for conceding involvement in robbery-homicide in opening statement and closing argument, where petitioner admitted as much in statements to police and counsel tried to shift blame to other defendants).

While some of the statements cited by Moore appear to be damaging in isolation, in context, it is clear that they were part of counsel's constitutionally sufficient opening and closing statements at the mitigation phase. The Ohio courts' rejection of this claim was not an unreasonable application of *Strickland*.

## Claims (6) and (8)

In Claim (6) Moore alleges that the trial court erred in giving an "acquittal first" instruction that gave jurors the impression that they had to unanimously reject the death penalty before choosing to sentence him to life in prison. In Claim (8) he also alleges ineffective assistance of appellate counsel for failing to raise this argument on appeal. The district court granted relief on Claim (6), conditioned on Moore's being allowed to appeal in state court with effective assistance of counsel.[14]

It is important to keep the two claims distinct. Claim (6) argues that the jury instruction was constitutionally deficient. Because habeas exists only to correct errors of federal law, not state law, *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991), this claim is cognizable here only if it refers to the federal constitution. It would not matter if the jury instruction was improper under state law. Claim (8) is the ineffective assistance of appellate counsel claim. Appellate counsel could be constitutionally deficient for failing

---

[14]The district court's choice of remedy appears to be more consistent with a finding of ineffective assistance of appellate counsel rather than a grant of relief for the underlying claim that the jury instruction was unconstitutional. Regardless, we find that neither claim is meritorious.

to raise some federal *or* state law claim on appeal.  The two claims can be interrelated, but they are not automatically so.

### A. Claim (6)

Though Moore objected to various aspects of the jury instructions in state court, he never objected to them as unconstitutional acquittal-first instructions.  Accordingly, Moore procedurally defaulted Claim (6); this default can only be excused by showing cause and prejudice.  *See McFarland*, 356 F.3d at 699.  Ineffective assistance of appellate counsel can constitute cause, *id.*, and Moore argues that it does here.  Thus, the viability of Moore's acquittal-first claim hinges entirely on whether Moore can show that, as a matter of clearly established federal law, his counsel was ineffective by failing to raise that claim.  Because, as addressed below, we find that he cannot make that showing, we reverse the district court's ruling on Claim (6).

### B. Claim (8)

As noted, Claim (8) raises both federal- and state-law considerations.  We address both in turn, starting with the federal-law claim because if we find it meritless, that finding also disposes of Claim (6).

#### 1. Federal claim

Moore first raised the claim that his appellate counsel was ineffective for failing to challenge the alleged acquittal-first jury instruction in his Rule 26(B) application, and the Ohio Supreme Court rejected that claim on the merits, *Moore*, 758 N.E.2d at 1132.  Thus, we must defer to that court's decision on the issue of ineffective assistance of appellate counsel unless it was an unreasonable application of *Strickland*.  But we apply only modified deference because the Ohio Supreme Court's adjudication of the ineffective assistance claim provided "'little analysis on the substantive constitutional issue.'"  *Davie*, 547 F.3d at 315 (quoting *Vasquez v. Jones*, 496 F.3d 564, 569 (6th Cir. 2007)).  Under this modified approach, we "conduct a careful and independent review of the record and applicable law, but cannot reverse unless the state court's decision is contrary to or an unreasonable application of federal law." *Id.* (internal quotation marks

omitted).  The only federal law to which we may look in making this determination is "clearly established federal law, as determined by the Supreme Court."  *Id.* (citing 28 U.S.C. § 2254(d)(1)); *see also Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) ("[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court' . . . [and] therefore cannot form the basis of habeas relief under AEDPA.").

To demonstrate ineffective assistance of appellate counsel, Moore must first show "deficient performance," which means he must demonstrate that his appellate counsel made an "objectively unreasonable decision" to omit the acquittal-first claim. *Webb*, 586 F.3d at 399 (citing *Robbins*, 528 U.S. at 285, 288).  Moore must then show that his appellate counsel's deficiency prejudiced him, which requires demonstrating that there was "'a reasonable probability that, but for his counsel's unreasonable failure to' raise this issue on appeal, 'he would have prevailed.'"  *Id.* (quoting *Robbins*, 528 U.S. at 285).  Moore cannot make either showing.

In *Mills v. Maryland*, 486 U.S. 367, 380–81 (1988), the Supreme Court held a jury instruction unconstitutional that told the jury that it could not consider a particular mitigating circumstance unless all 12 jurors agreed that the circumstance had been proved to exist.  Under *Mills*, then, courts have recognized that "'each juror [must] be permitted to consider and give effect to all mitigating evidence in deciding whether aggravating circumstances outweigh mitigating circumstances.'"  *Smith v. Spisak*, 130 S. Ct. 676, 682 (2010) (edits omitted) (quoting *McKoy v. North Carolina*, 494 U.S. 433, 442–43 (1990)).  The Supreme Court has never extended that rule to jury instructions that suggest a jury must first unanimously reject the death penalty before considering a life sentence.  Notably, though, this circuit has done so, thereby adopting the "acquittal-first" doctrine for habeas cases.  *See Davis v. Mitchell*, 318 F.3d 682, 689 (6th Cir. 2003).

But the Supreme Court has rejected this circuit's approach.  In the recent *Spisak* case, which arose from this circuit, the Supreme Court reviewed acquittal-first jury instructions that are very similar to the ones Moore raises in this case.  The Supreme

Court explained that it had never held such jury instructions unconstitutional and that "[w]hatever the legal merits of the [acquittal first] rule . . . [such] jury instructions [a]re not contrary to clearly established Federal law."  130 S. Ct. at 684.  Thus, even in 2010—when *Spisak* was decided—the acquittal-first rule was not "clearly established federal law, as determined by the Supreme Court."  18 U.S.C. § 2254(d)(1).  And the Supreme Court still has not adopted that rule.  *See, e.g.*, *Bobby v. Mitts*, 131 S. Ct. 1762, 1765 (2011) (affirming *Spisak*-like Ohio jury instructions as "not contrary to clearly established Federal law" (internal quotation marks omitted)).

Against this backdrop, Moore's ineffective assistance of appellate counsel claim must fail.  For purposes of federal habeas review, the acquittal-first doctrine was not clearly established federal law at the time of his direct appeal and will only become clearly established for those purposes when, if ever, the Supreme Court adopts it.  *See Spisak*, 130 S. Ct. at 684; *Parker*, 132 S. Ct. at 2155 ("[C]ircuit precedent . . . cannot form the basis of habeas relief under AEDPA.").  Appellate counsel must be competent, not clairvoyant; failing to make a then-non-existent claim (and still-non-existent claim) was not deficient performance and cannot have prejudiced Moore.  We therefore conclude that Ohio courts did not unreasonably apply or otherwise violate clearly established federal law when they rejected Moore's argument that his appellate counsel was ineffective for failing to raise a federal acquittal-first claim.

Our conclusion is bolstered by the fact that Moore could not show deficient performance or prejudice even if we were to consider the jury instruction in his case under the standard announced in *Davis*.  Moore's instruction cannot possibly be considered an acquittal-first instruction.  In fact, it is just the opposite.  This was the instruction:

> In reaching a verdict in this proceeding, you must consider all the evidence admitted at both trials and the arguments of counsel.  You must then determine whether the State of Ohio has proven beyond a reasonable doubt that the aggravating circumstances in each count of aggravated murder which Lee Moore was found guilty of committing are sufficient to outweigh the mitigating factors present.
> All twelve jurors must agree on a verdict.  If all twelve members of the jury find by proof beyond a reasonable doubt that the aggravating

circumstances in a particular count of aggravated murder which the defendant was found guilty of committing outweigh the mitigating factors, then you must recommend to the Court a sentence of death as to that particular count.

On the other hand, if, after considering all the relevant evidence admitted at the two trials and the arguments of counsel, you find that the State of Ohio failed to prove by proof beyond a reasonable doubt that the aggravating circumstances in a particular count of aggravated murder which the defendant was found guilty of committing outweigh the mitigating factors, then you will not recommend to the Court a sentence of death as to that particular count of aggravated murder.

In that event, you will determine which of two possible life imprisonment sentences to recommend to the Court as to that particular count of aggravated murder.

The jury verdict form gave the following three options:

We, the jury, unanimously find by proof beyond a reasonable doubt that the aggravating circumstance the defendant was found guilty of committing in Count 1 outweighs the mitigating factors, and, therefore, we do further hereby recommend to the Court that the sentence of death be imposed on the defendant. . . .

. . . .

We, the jury, unanimously find that the aggravating circumstance the defendant was found guilty of committing in Count 1 does not outweigh the mitigating factors and recommend that the defendant be sentenced to life imprisonment with parole eligibility after serving thirty full years of imprisonment. . . .

. . . .

We, the jury, unanimously find that the aggravating circumstance the defendant was found guilty of committing in Count 1 does not outweigh the mitigating factors, and recommend that the defendant be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment. . . .

Nowhere did the court instruct or even intimate that the jury must *first* unanimously find that the death penalty was inappropriate before considering other sentences. On the contrary, the jury was clearly instructed (1) that they may impose the death penalty *only* if they find unanimously and beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors, and (2) that, "on the other hand," they may impose a life sentence if they find that the balance weighs in favor of

mitigation. These jury instructions are not only distinct from the ones in *Davis*, they are essentially identical to the ones upheld by the Supreme Court in *Spisak* and by this Court in *Scott v. Mitchell*, 209 F.3d 854, 873 (6th Cir. 2000). *See, e.g.*, *Spisak*, 130 S. Ct. at 683–84 (recounting the jury instructions).

As a final matter, *Davis* was concerned with instructions that, like Moore's, require all twelve jurors to agree on a verdict. But that requirement is mandated by Ohio law and, as a matter of federal constitutional law within this circuit, mandating jury unanimity for a sentence is constitutional so long as the jury is not instructed that it must unanimously reject the death penalty first. *See, e.g.*, *Coe v. Bell*, 161 F.3d 320, 338 (6th Cir. 1998) (upholding Tennessee's requirement that the jury unanimously find whether the mitigating factors outweigh the aggravating factors). Moore can cite no Supreme Court case holding that requiring unanimity for whatever sentence—life or death—is unconstitutional, nor has this Circuit even suggested that requiring unanimity is forbidden. *See Williams v. Anderson*, 460 F.3d 789, 808–09 (6th Cir. 2006).

In sum, even if we could treat *Davis*'s version of the acquittal-first rule as dispositive here—and, as explained above, we cannot—*Davis* does not apply to Moore's jury instruction. Thus, once again, the decision of Moore's appellate counsel not to raise an acquittal-first claim was neither deficient nor prejudicial, and Ohio courts did not unreasonably violate clearly established federal law in so holding.

#### 2. State law

Moore also claims that his appellate counsel was ineffective for failing to object to the jury instructions as violating *Ohio* law. We cannot grant habeas relief on pure state law claims, *Estelle*, 502 U.S. at 67, but we can consider whether Moore's appellate counsel was *constitutionally* ineffective for failing to bring state law claims. That said, modified AEDPA deference still applies because Moore brought this claim in his Rule 26(B) motion and the state courts rejected it on the merits. *See Moore*, 758 N.E.2d at 1133.

In its 1996 decision *State v. Brooks*, the Ohio Supreme Court considered instructions that included the following statement: "You are now required to determine

unanimously that the death penalty is inappropriate before you can consider a life sentence." 661 N.E.2d at 1040. The court found that this instruction violated both a state statute and the constitutional principles in *Mills. Id.* at 1041–42. The court also announced a new rule: "In Ohio, a solitary juror may prevent a death penalty recommendation by finding that the aggravating circumstances in the case do not outweigh the mitigating factors. Jurors from this point forward should be so instructed." This is referred to as the "*Brooks* instruction."

This new state court rule would not have been availing to Moore's appellate counsel had he raised the issue on direct appeal. For cases that, like Moore's, were tried before *Brooks*, the Ohio Supreme Court reviews only for plain error. *See State v. Madrigal*, 721 N.E.2d 52, 68 (Ohio 2000) (citing cases). In *State v. Goff*, 694 N.E.2d 916, 922 (Ohio 1998), the court addressed such a situation. The defendant was tried before *Brooks* was issued and the trial court gave a jury instruction that did not include the not-yet created *Brooks* instruction. *Id.* at 921. On appeal, the Ohio Supreme Court reviewed for plain error. It stated:

> The jury was informed that it must be unanimous in finding that the aggravating circumstances outweighed the mitigating factors. The jury was also informed that if it did not make that unanimous finding, one of the life verdicts "shall [be found]." Again, it would be preferable to include the missing piece, that the jury does not have to unanimously find that the aggravating circumstances do not outweigh the mitigating factors before considering the life sentence options. Yet, the "substance" of what the jury must determine was included in the charge given; therefore, appellant was not prejudiced.

*Id.* at 922. In sum, because *Brooks* had not been issued, the *Brooks* instruction was not required. *See State v. Mitts*, 690 N.E.2d 522, 530–31 (Ohio 1998) (same); *State v. Taylor*, 676 N.E.2d 82, 95–96 (Ohio 1997) (same); *see also Madrigal*, 721 N.E.2d at 67–68 (finding no error in trial held after *Brooks* issued where instructions required jury to unanimously decide on death sentence or unanimously find one of two life sentences).

As was the case in *Goff*, Moore's trial took place before *Brooks* was issued. In this case, Moore was sentenced in November 1994. The Ohio Supreme Court decided *Brooks* on March 4, 1996. The Ohio Court of Appeals decided Moore's appeal on June

26, 1996. So, while the appeal was pending, Moore's appellate counsel could have made the argument that a *Brooks* instruction should have been given at trial, since the decision in that case was issued during the appeal. But as the Ohio Supreme Court held in *Goff*, because the trial took place before *Brooks*, that instruction was not required. Furthermore, the instruction in Moore's case was nearly identical to that in *Goff* and was far from the impermissible acquittal-first instruction overturned in *Brooks*. Moore's counsel was not likely to succeed on this claim, so Ohio courts did not unreasonably apply *Strickland* in finding that appellate counsel did not provide ineffective assistance by failing to raise this claim.

Moore also claimed that his appellate counsel should have argued that the jury instruction violated Ohio Rev. Code § 2929.03(D)(2). The version of that statute effective at the time of trial and appeal read as follows:

> Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, [and] arguments of counsel . . . the trial jury, if the offender was tried by a jury, shall determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors present in the case. If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. *Absent such a finding*, the jury shall recommend that the offender be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment.

*Id.* (emphasis added). This is essentially a variation of the argument that Moore's trial court should have given the jury a *Brooks* instruction. But as the court stated in *Goff*, though it would have been preferable for the trial court to emphasize that a solitary juror could prevent the death penalty from being imposed, the trial court was not yet required to do so. It also would have been preferable for the trial court to reiterate that the default sentence, absent a unanimous agreement on the sentence of death, is a sentence of life imprisonment. But the *Goff* court did not require this either, approving an instruction that gave two options: (1) death "only if you unanimously find by proof beyond a

reasonable doubt that the aggravating circumstances outweigh the mitigating factors";
or (2) "unanimously sign a verdict for [one of two life sentences]." These are the same
options given in Moore's instructions. Even if Moore's appellate counsel had raised this
state law argument, he would not have succeeded. The state court did not unreasonably
apply *Strickland* in so finding.

We deny relief on Moore's claim that his appellate counsel was ineffective for
failing to object to the jury instructions on both federal constitutional and state law
grounds.

## Claims (7)(A), (C), (D), and (18)(D)[15]

## Claim (7)(A)

Moore claims that the prosecutor engaged in misconduct that deprived Moore of
due process during the sentencing phase by making statements that urged the jury to
identify with the victim.

**Facts**

In his opening statement in the sentencing phase, the prosecutor made the
following comment to which Moore objected:

> After all that time in the trunk, I'm sure he's freezing, he's cramped, he's
> been bounced around. Just for one moment maybe there was a little bit
> of hope for Mr. Olinger. But I'm sure when he got out and saw the .357
> was still in the hands of Lee Moore, and he saw where he was, he
> knew—[Defense objection overruled].

Later on, in his closing argument, the prosecutor made the following statements to which
Moore objected:

> He drives him down, the car stops for a while, [Larry] Kinley gets in,
> Holmes gets out, and then there is a conversation. While he's in the
> trunk, he, Lee Moore, is saying he's got a guy in the trunk he's going to

---

**15**Claim (18)(D) simply restates the grounds for Claims (7)(A), (C), and (D). Moore does not
brief or discuss it separately.

kill. Can you imagine the abject terror Melvin Olinger has at this point? [Defense objection overruled]

They drove to the factory. Again, he's ordered out at gunpoint. Is the trunk open or shut? It doesn't matter. Does it really matter? He gets him out of the car. Was he begging for his life? You bet he was.  [Defense objection overruled]

**Procedural Posture**

At trial, the court overruled each of Moore's objections.  We review the state court's ruling under the AEDPA standard, for unreasonable application of clearly established federal law as declared by Supreme Court precedent.

Moore also draws our attention to several additional comments as examples of prosecutorial misconduct, but because he did not raise any claims concerning those specific comments in state court, he has procedurally defaulted any claims regarding them.  Ordinarily, procedural default can be excused on a showing of cause and prejudice. *McFarland*, 356 F.3d at 699.  Ineffective assistance of counsel can constitute cause. *Id.*  Moore could have raised ineffective assistance of counsel on appeal, but he did not.  He has therefore defaulted his only excuse for procedural default. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) (holding that excuse for procedural default can itself be procedurally defaulted).

**Reweighing cures any errors**

As to the allegedly improper comments to which Moore objected at trial, the Ohio Supreme Court's reweighing of the aggravating and mitigating factors is enough to cure any possible errors.  In *Baston v. Bagley*, 420 F.3d 632, 638 (6th Cir. 2005), we held that state court reweighing rendered harmless any possibility that the jury may have considered improper aggravating factors.  We extended this reasoning in *Lundgren v. Mitchell*, 440 F.3d 754 (6th Cir. 2006), to cover improper comments by the prosecutor. In that case, the prosecutor improperly commented at sentencing on the unsworn nature of the defendant's statement to the jury.  We held that state reweighing cured any errors from such misconduct.  *See id.* at 783; *see also Sheppard v. Bagley*, 604 F. Supp. 2d

1003, 1031 (S.D. Ohio 2009) (applying *Lundgren* to prosecutor's improper comments in closing arguments).

We affirm the district court's denial of relief on this claim.[16]

**Claim (7)(C)**

Moore also claims that the prosecutor made several additional comments during his closing argument at mitigation that impermissibly urged the jury to rely on non-statutory aggravating factors as a basis to impose the death penalty.

Moore points to the following statements: "Think about the coldness and premeditation in which Melvin Olinger was stalked." "These are the aggravating circumstances that you're balancing against mitigation. What did Mr. Olinger do to deserve this?" "Can you imagine the abject terror Melvin Olinger has at this point?" "Was he begging for his life?" "These are all the facts that are aggravating circumstances to be weighed against the total void of mitigation presented to you today." The Ohio Supreme Court held that the first two comments "tended to raise coldness and premeditation as aggravating circumstances" but that the error was not outcome-determinative. *Moore*, 689 N.E.2d at 14. The court ruled that the third set of comments "invited the jury to speculate on facts not in evidence and thus may constitute error," but found that "neither comment materially prejudiced Moore." *Id.* The court held that the final comment was clearly improper, noted that Moore's trial counsel did not object, and found that the comment was not prejudicial. *Id.*

The district court held that any error caused by the prosecutor's reference to non-statutory aggravating circumstances was cured by the state appellate courts' reweighing of the aggravating circumstances and mitigating factors. *Moore*, 531 F. Supp. 2d at 889–90.

---

[16]We note, however, that we affirm the district court on different grounds. The district court held that the comments were improper, but that there was no prejudice because evidence of guilt was overwhelming. *Moore*, 531 F. Supp. 2d at 888. But the improper comments took place at the penalty phase. The overwhelming evidence of guilt was irrelevant because the jury had already found Moore guilty. At sentencing, the jury was required to decide whether the aggravating circumstances outweighed the mitigating circumstances, necessitating a verdict of death.

Once again, we find that any possible preserved errors do not justify habeas relief. First, a violation of state law does not necessarily create a constitutional violation. Under Ohio law, the nature and circumstances of the offense are mitigating factors to be weighed against the aggravating circumstances, and not as aggravating factors themselves. *Fox v. Coyle*, 271 F.3d 658, 669 (6th Cir. 2001). Moore argues that in several of his comments the prosecutor urged the jury to consider the nature and circumstances of the crime as aggravating circumstances. But "consideration of a non-statutory aggravating circumstance, even if contrary to state law, does not violate the Constitution." *Nields v. Bradshaw*, 482 F.3d 442, 451 (6th Cir. 2007) (quoting *Smith v. Mitchell*, 348 F.3d 177, 210 (6th Cir. 2003)); *see also Barclay v. Florida*, 463 U.S. 939, 956–58 (1983).

Second, the Ohio Supreme Court's mandatory reweighing of the aggravating circumstances and mitigating factors under Ohio Rev. Code §§ 2929.03(D)(3) and 2929.05(A) rendered any error harmless. *See Nields*, 482 F.3d at 451 (jury's consideration of a non-statutory aggravating factor was not prejudicial where the state appellate courts independently reweighed only the statutory aggravating circumstances against the mitigating factors); *Baston*, 420 F.3d at 637 (finding that reweighing satisfied the requirements of *Clemons v. Mississippi*, 494 U.S. 738 (1990), and cured the alleged sentencing errors). Moore's claim does not entitle him to habeas relief.

**Claim (7)(D)**

Moore claims that the prosecutor violated his Fifth Amendment rights by commenting on the unsworn statement Moore gave during mitigation. Moore points to two statements made by the prosecutor:

> . . . Their last piece is the defendant's statement, unsworn statement, so he does not have to face any cross-examination or face any tough questions from the prosecutors. And you can consider that when you consider his credibility as a witness.
> . . . .
> He goes to Butler County. And during the guilt phase you heard in our closing that you could infer he went to Butler County because he wanted to choose his victim, someone who couldn't find—wouldn't be missed for quite some time. If there is some [big] mystery why he went

to Butler County besides that, why didn't he tell you that today in his unsworn statement?

Prosecutorial misconduct can merit habeas relief only if the prosecutor's remarks render the trial so unfair as to be a denial of due process. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 643–45 (1974). "'[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor.'" *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). In order to obtain relief on a claim of prosecutorial misconduct, a petitioner "must demonstrate that the prosecution's conduct was both improper and so flagrant as to warrant reversal." *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005). A prosecutor violates a defendant's Fifth Amendment rights if he comments on the defendant's refusal to testify. *See Griffin v. California*, 380 U.S. 609, 613–14 (1965). Under Ohio law, a defendant may present an unsworn statement at sentencing without subjecting himself to cross-examination. Ohio Rev. Code § 2929.03(D)(1). If he does so, the prosecution may "remind[] the jury that the defendant's statement was not made under oath, in contrast to the testimony of all other witnesses." *Durr v. Mitchell*, 487 F.3d 423, 443 (6th Cir. 2007) (internal quotation marks omitted); *see also Bedford v. Collins*, 567 F.3d 225, 236 (6th Cir. 2009), *cert. denied*, 130 S. Ct. 2344 (2010). However, the prosecution may not comment extensively on the matter. *DePew v. Anderson*, 311 F.3d 742, 750 (6th Cir. 2002).

If this court finds improper conduct, we consider four factors to determine whether the challenged conduct is flagrant: "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the petitioner; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant." *Bates*, 402 F.3d at 641. Finally, we assess the prejudicial impact of constitutional error under the "substantial and injurious effect" standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *Fry v. Pliler*, 551 U.S. 112, 121–22 (2007).

The prosecutor's first comment was permissible because it was limited to reminding the jury that Moore's statement was not made under oath. *See Bedford*,

567 F.3d at 236. Moreover, the trial court instructed the jury that Moore had the right to give an unsworn statement and not to subject himself to cross-examination. *See Joseph v. Coyle*, 469 F.3d 441, 473–74 (6th Cir. 2006) (petitioner not entitled to habeas relief where prosecutor's comment on the defendant's failure to take the stand in the guilt phase was not flagrant and the court instructed the jury about defendant's right not to testify).

The second comment—the prosecutor's rhetorical question about why Moore did not explain his decision to go to Butler County if not to choose a victim— drew attention to Moore's choice not to testify under oath and may have encroached upon Moore's Fifth Amendment right not to testify against himself. But although improper, the comment was not flagrant. Whether or not the remark was deliberate, it was isolated and did not tend to mislead the jury or prejudice Moore. The comment did not address the aggravating circumstances or mitigating factors and, as we have already explained, evidence of aggravating circumstances was strong and proof of mitigating factors was weak. *See Bates*, 402 F.3d at 641. Reviewing the comment for harmless error, we conclude that it did not have substantial and injurious effect upon the jury's verdict. *See Fry*, 551 U.S. at 121–22. Lastly, as with the other claims of prosecutorial misconduct, the Ohio Supreme Court's reweighing of the aggravating circumstances and mitigating factors eliminated the potential for prejudice. *See Bedford*, 567 F.3d at 236.

**Claim (13)(D)**

Moore alleges that the prosecutor used, and the trial court condoned, a peremptory challenge to remove an African-American woman from the jury on the basis of her race.

**Facts**

When the prosecutor excused a prospective juror named Sandra Freeman with a peremptory challenge, Moore's counsel challenged the request as racially motivated under *Batson v. Kentucky*, 476 U.S. 79 (1986). The prosecutor noted that he had challenged three white but no black prospective jurors for cause and offered three

reasons for removing juror Freeman. First, she stated on her questionnaire that she felt that alcoholism or drugs negatively impact a child's development and Moore planned to rely on alcohol and drug use as a mitigating factor. Second, she stated that her uncle had once served as a public defender. Third, she had her arms folded when the prosecutor questioned her, which struck him as indicating that she would not be receptive to the State's presentation of its case. In response, Moore's counsel argued that many white jurors gave responses similar to Freeman's when asked about drugs and alcohol on the questionnaires, that excusing white jurors did not disprove discriminatory intent, that Freeman said she could follow the court's instructions, and that a white juror whom the prosecutor did not excuse displayed unsatisfactory body language. The trial court accepted the prosecutor's explanations that he wanted the juror removed because the juror's body language conveyed some hostility and that the juror's uncle was a defense attorney. The Ohio Supreme Court cited a state court case for its *Batson* analysis and concluded that the trial court's finding of no discriminatory intent was not clearly erroneous. *Moore*, 689 N.E.2d at 9–10 (citing *State v. Hernandez*, 589 N.E.2d 1310, 1313 (Ohio 1992)).

The district court held that the state court's decision that the prosecutor had not demonstrated purposeful discrimination in striking the potential juror was not unreasonable or clearly erroneous.

**Analysis**

A *Batson* claim presents a mixed question of law and fact. *Braxton v. Gansheimer*, 561 F.3d 453, 458 (6th Cir. 2009). "Mixed questions of law and fact are reviewed under the 'unreasonable application' prong of . . . AEDPA." *Railey v. Webb*, 540 F.3d 393, 397 (6th Cir. 2008). Whether or not a prosecutor intended to discriminate on the basis of race is a question of fact. *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003). On questions of fact, the habeas petitioner has the burden of rebutting, by clear and convincing evidence, the presumption that the state court's factual findings were correct. *See* 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

In *Batson*, the Supreme Court held that the Equal Protection Clause precludes the state from exercising peremptory challenges so as to exclude members of minority groups from service on petit juries. 476 U.S. at 89. The Court has summarized the *Batson* analysis as follows:

> Under our *Batson* jurisprudence, once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination. The second step of this process does not demand an explanation that is persuasive, or even plausible. "At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."

*Purkett v. Elem*, 514 U.S. 765, 767–68 (1995) (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991) (plurality opinion) (citations omitted)). "[I]n conducting [a *Batson*] hearing, the trial judge must assess the plausibility of the prosecution's proffered explanation 'in light of all evidence with a bearing on it.'" *United States v. Torres-Ramos*, 536 F.3d 542, 559 (6th Cir. 2008) (quoting *Miller-El v. Dretke*, 545 U.S. at 251–52). "[T]he critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike." *Miller-El v. Cockrell*, 537 U.S. at 338–39. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El v. Dretke*, 545 U.S. at 241; *see also United States v. Odeneal*, 517 F.3d 406, 420 (6th Cir. 2008) (finding *Batson* violation where prosecutor said he excluded African-American because she had been on a jury that acquitted, but did not exclude a white person who served on same jury). However, "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett*, 514 U.S. at 768. Under § 2254(d)(2), "a federal habeas court can only grant [a] petition if it was

unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Rice v. Collins*, 546 U.S. 333, 338 (2006).

The district court properly denied Moore's *Batson* claim.  The Ohio Supreme Court analyzed Moore's *Batson* claim under the following framework:

> In order to state a prima facie case of purposeful discrimination under *Batson*, an accused must demonstrate (1) that members of a recognized racial group were peremptorily challenged and (2) that the facts and circumstances raise an inference that the prosecutor used the peremptory challenge to exclude the jurors on account of their race.  If the accused makes a prima facie case of discrimination, the state must then come forward with a neutral explanation.  A trial court's finding of no discriminatory intent "will not be reversed on appeal absent a determination that it was clearly erroneous."

*Moore*, 689 N.E.2d at 9 (citations and quotations omitted).  The Ohio court noted that the prosecution exercised one of its peremptory challenges against an African-American woman, reviewed the prosecution's explanation for its challenge, and noted the bases for the trial court's decision:  that a good attorney looks at body language, the woman appeared a little hostile to the prosecution, and she might have been predisposed to the defense and "anti-prosecutor" because her uncle was a defense attorney.  The Ohio Supreme Court concluded that the trial court's finding of no discriminatory intent was not clearly erroneous.  *Id*. at 9–10.

The Ohio Supreme Court's decision was not an unreasonable application of *Batson* and was not based on an unreasonable determination of the facts in light of the evidence presented to the state courts.  Moore made out a prima facie case of discrimination because he and juror Freeman are both African-American.  *See Batson*, 476 U.S. at 96.  The state court did not expressly address whether Moore established a prima facie *Batson* claim, but "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez*, 500 U.S. at 359.  The prosecutor came forward with race-neutral explanations for his choice to challenge the juror, which the trial court accepted as valid and not inherently discriminatory.  *See Purkett*, 514 U.S. at

767–68.  The juror expressed sympathy for Moore's strategy of pointing to his alcohol and drug abuse to mitigate his punishment, the juror's uncle worked as a public defender, and the prosecutor and the trial court interpreted the juror's body language as conveying hostility to the prosecution.  A juror's body language is a permissible basis for a race-neutral challenge.  *See Braxton*, 561 F.3d at 462.  Moore did not rebut the presumption that the state court's factual findings were correct and did not show that the prosecutor's strike was racially motivated.

The parties expanded the record to include the juror questionnaires, but we may not consider them.  Moore admits that while he briefly referenced the jury questionnaires at the state trial court, he did not present them to the Ohio Court of Appeals or the Ohio Supreme Court on direct appeal.[17]  Moore does not argue that the questionnaires were unavailable to him.  Since the juror questionnaires were not presented to the state court, they should be excluded from consideration in light of *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), as we explained in relation to Claim (2)(B).  Under AEDPA, if the claim has been adjudicated in state court on the merits, we look to see if the state court unreasonably applied clearly established law or based its decision "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  § 2254(d).  Even by agreement, the parties cannot circumvent this requirement.

The Ohio Supreme Court, which did not have the juror questionnaires before it, credited the prosecution's race neutral reasons and found that the trial court's finding of no discriminatory intent was not clearly erroneous.  *Moore*, 689 N.E.2d at 10.  The trial court's finding that the prosecutor's legitimate, non-discriminatory explanation was credible is a finding of fact.  *See Miller-El v. Cockrell*, 537 U.S. at 339.  Under AEDPA, Moore can rebut this finding only with clear and convincing evidence.  *Id.* at 340.  He offers none.

---

[17]Moore tries to take back this concession in a supplemental brief, noting that the questionnaires were before the state trial court and speculating that they were raised on appeal.  We decline to accept his speculation as a reason to disbelieve his initial concession.  In any event, as we explain below, the questionnaires would not help Moore's cause even if we did consider them.

Even if we were to consider the questionnaires, we would conclude that they do not carry the day for Moore. Moore argues that the questionnaires of Freeman and three white jurors show that the prosecutor's reasons for striking Freeman were pretextual. The juror questionnaires asked, among other things, what the jurors considered positive and negative influences on a child's development and whether the jurors, members of their families, or close friends were affiliated with prosecuting attorneys or public defenders. Donna England listed drugs, alcohol, no curfew, and being left alone too much as negative influences, and did not indicate that any of her family or friends were attorneys. Guy Hopkins stated that poor role models, poor home environment, and lack of parental support were negative influences, and that two of his friends were attorneys. William Miller wrote that non-caring, non-involvement, and abusive treatment were negative influences on a child, and indicated that his college roommate was a lawyer and public defender. Freeman, the black juror struck by the prosecution, indicated that inconsistent parenting, alcoholism or drugs, and a lack of religious background were negative influences, and that her uncle was a lawyer. She checked both "public defender" and "district attorney or United States Attorney" on the form. The jurors were also asked questions in voir dire. Some of the questions were of a general nature, such as whether the juror would follow the law and the judge's instructions, and some were specifically directed to the juror's responses on the questionnaires. In addition, the prosecutor asked some jurors to rate their support of the death penalty on a scale of one to ten.

No individual juror whom Moore seeks to compare to Freeman had all of the characteristics cited by the prosecutor to justify striking Freeman. One expressed similar views about drugs and alcohol, two knew attorneys, including a public defender, and none was identified as displaying body language hostile to the prosecution. One of the two jurors who knew attorneys rated his support of the death penalty at ten, and the other seven. Freeman said she could follow the law and vote for the death penalty but was not asked to rate her views numerically. Furthermore, Freeman's negative body language distinguished her from other potentially similar jurors.

Even considering the juror questionnaires, because the jurors Moore identifies were not otherwise similar to Freeman, the evidence does not tend to prove purposeful discrimination. *See Miller-El v. Dretke*, 545 U.S. at 241. There was no unexplained disparate treatment, and Moore did not show that the prosecutor's explanation was pretextual or established a *Batson* violation. *See Odeneal*, 517 F.3d at 420.

**Claim (15)**

Moore contends that the trial court violated his constitutional right to individualized sentencing by failing to consider relevant mitigation evidence, particularly the effect of his parents' divorce on him; the bullying, teasing, and beating he received from his peers; his feelings that he did not fit in with his peers; his substance abuse and dependency; his capability of being productive in a structured environment; and his unrealized potential. Moore is correct that the trial court did not mention these factors specifically. It found Moore's age as a mitigating factor, and it referred generally to his "history, character, and background," but then stated that, "As to any other factors that are relevant to the issue of whether the defendant should be sentenced to death, the Court really cannot find any." Moore never objected to the court's consideration or alleged lack of consideration of any of these matters. In his Rule 26(B) application, he claimed that his appellate counsel was ineffective for failing to raise the claim on direct appeal. The Ohio Court of Appeals denied his claim and the Ohio Supreme Court affirmed. *Moore*, 758 N.E.2d at 1132–33. The district court denied relief. *Moore*, 531 F. Supp. 2d at 904.

Because the issue was not raised on direct appeal, it is procedurally defaulted. Default can be excused by showing cause (ineffective assistance of counsel) and prejudice. *McFarland*, 356 F.3d at 699. There was no prejudice here, because any possible constitutional error was cured by the Ohio Supreme Court's reweighing the mitigating factors and aggravating circumstances. *See Baston*, 420 F.3d at 637–38. Ohio law requires the appellate courts to independently reweigh the aggravating and mitigating circumstances in death penalty cases and determine whether the death sentence was appropriate. Ohio Rev. Code § 2929.05(A). In Moore's case, the Ohio

Supreme Court described the mitigating evidence in detail and included all of the factors Moore argues the trial court should have considered: the effects of his parents' divorce, the bullying he experienced, his alienation from his peers, his alcohol and marijuana use beginning at age fifteen, his capacity to function well in a prison environment, and his unrealized potential. *Moore*, 689 N.E.2d at 19–20. The court found that Moore's character and background were entitled to very little weight in mitigation and concluded that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. *Id*. at 20. Thus, the Ohio Supreme Court complied with Supreme Court precedent, considered the mitigating evidence Moore presented, and cured any error by the trial court. *See Tibbetts v. Bradshaw*, 633 F.3d 436, 446–47 (6th Cir. 2011); *Baston*, 420 F.3d at 637–38.

*Davis v. Coyle*, 475 F.3d 761 (6th Cir. 2007), cited by Moore, is readily distinguishable. In that case, the petitioner's original sentence was vacated and he returned to the state trial court for resentencing. The three-judge panel refused to allow the petitioner to introduce at the resentencing new mitigation evidence of his good behavior in prison. The court sentenced him to death based solely on the evidence presented at the original sentencing hearing. *Id*. at 770–71. This court held that the trial court erred by excluding the mitigation evidence. *Id.* at 774–75. We held that reweighing was not a proper remedy because the improperly excluded evidence had never been put into the record, and the state appellate courts could not reweigh what had never been weighed in the first place. *Id.* In Moore's case, the mitigation evidence was before the trial court; the court simply found that it was outweighed by the aggravating circumstances. The evidence was never excluded from the record altogether.

Because Moore's underlying claim lacks merit, he cannot demonstrate that he was prejudiced by his appellate counsel's failure to raise it. *See Davie*, 547 F.3d at 312. The claim is procedurally defaulted, and that default is not excused.

**Claim (18)(C)**

Moore argues that the prosecutor committed misconduct during the guilt phase by presenting testimony from the victim's father, denigrating defense counsel,

encouraging the jury to perform its own experiment, and commenting on defense counsel's failure to present expert witnesses.

**Claim (18)(C)(i)**

Moore claims that the prosecutor committed misconduct by presenting testimony from the victim's father in order to elicit sympathy from the jury. The victim's father testified that the victim had a sister, he worked out of town, he hugged and kissed his mother before he left the house the night he was killed, a friend of his had died, and his family did not know what to do when they discovered he was missing. Moore complains that none of this testimony was relevant to the elements of the charges against him.

Moore did not raise this claim on direct appeal. He *did* raise it in his post-conviction relief petition, but the state court found it barred by res judicata under *Perry* because the claim could have been raised on direct appeal but was not. The Ohio Supreme Court could have taken the same tack when the claim came before that court via Moore's Rule 26(B). *See Moore*, 758 N.E.2d at 1134 (Cook, J., concurring in judgment) (arguing that not only *could* the court have taken that route, it *should* have). But instead, it denied the claim on the merits, finding that Moore failed to raise a colorable claim of ineffective assistance of appellate counsel. *See, e.g.*, *Moore*, 758 N.E.2d at 1133 (denying the claim on the merits).

Because the Ohio Supreme Court rejected the claim on the merits, our role under AEDPA is solely to determine whether that rejection was an unreasonable application of federal law. This court has held that reference to victim impact evidence in the guilt phase is permissible. *Beuke v. Houk*, 537 F.3d 618, 639–40 (6th Cir. 2008). The introduction of such evidence is a constitutional violation only if it results in a fundamentally unfair trial. *Id.* Given the strength of the evidence of Moore's guilt, he has not shown that the victim impact evidence rendered his trial unfair. Nor can he show that the prosecution's conduct was both improper and flagrant. *See Bates*, 402 F.3d at 641. We therefore cannot say that the state court unreasonably applied *Strickland* in rejecting Moore's ineffective assistance claim in ruling on his Rule 26(B) application.

**Claim (18)(C)(ii)**

Moore has failed to argue before this court the claim that the prosecutor denigrated defense counsel, so that claim is deemed waived. *See* Fed. R. App. P. 28(a)(9)(A); *Landrum*, 625 F.3d at 913.

**Claim (18)(C)(iii)**

Moore also argues that the prosecutor encouraged the jury to perform its own experiment. As with his claim about the victim's father's testimony, Moore raised this ineffective assistance claim in his Rule 26(B) application and the Ohio Supreme Court denied it on the merits. That denial is entitled to AEDPA deference.

Under the Sixth and Fourteenth Amendments, a criminal defendant has the right to a jury that considers only the evidence presented at trial and the right to confront the evidence against him. *Parker v. Gladden*, 385 U.S. 363, 364–65 (1966); *Turner v. Louisiana*, 379 U.S. 466, 472–73 (1965). When a juror performs an out-of-court experiment and reports the results to other jurors, it "conflicts with [a criminal defendant']s constitutional right to a fair and impartial jury that considers only the evidence presented at trial." *Doan v. Brigano*, 237 F.3d 722, 733 (6th Cir. 2001), *overruled on other grounds by Wiggins v. Smith*, 539 U.S. 510 (2003). In this case, the prosecutor argued that the coroner's testimony supported the conclusion that the victim was kneeling when he was shot. The victim was found on his back with his legs beneath him and bent backwards. The prosecutor told the jury:

> [G]o back in the jury room—nothing prevents you from doing this. Go back and see how did he get in that position, what you have to do. You're like this (indicating). He's like this on his knees. . . . . After you're down like this, have somebody take that State's Exhibit 16 [the gun] and see what your reaction is. Do you think you might maybe turn away from that gun and tilt your head back a little bit?

The prosecutor's suggestion did not amount to misconduct. First, it did not call for a juror or jurors to experiment and report their findings to the other jurors. Instead, the prosecutor told the jury that they could, as a body, judge for themselves whether the evidence supported the theory that Moore shot the victim as the victim kneeled in front

of him.  Second, this point was not critical to the prosecution's case.  The prosecutor's argument was apparently intended to counter Moore's claim in his statement to the police that he shot the victim accidentally and not execution-style.  But Moore's co-defendant Kinley testified that Moore planned the killing and laughed about it afterward.  *Moore*, 689 N.E.2d at 5.  The exact manner of the victim's death was not important.  Finally, the trial court instructed the jury that it could consider only evidence from the witnesses who testified, the exhibits admitted by the court, and any stipulated facts.  Accordingly, there is no basis to conclude that the prosecutor's argument misled the jury or prejudiced Moore.  *See Bates*, 402 F.3d at 641.

**Claim (18)(C)(iv)**

Moore also complains that the prosecutor improperly shifted the burden of proof by commenting on the defense's failure to present an expert witness.  While arguing that the victim was on his knees when he was shot, the prosecutor said:  "The defense has every ability to subpoena in any expert they want to prove otherwise.  Where were they?  Where were they?"

Moore defaulted this claim and, even if he had not, the underlying claim is meritless.

There is nothing impermissible about the prosecutor's commenting on the defendant's failure to rebut evidence, so long as he does not violate the defendant's Fifth Amendment rights by commenting implicitly or explicitly on the defendant's failure to testify.  *See United States v. Clark*, 982 F.2d 965, 968–69 (6th Cir. 1993).  Moore makes no Fifth Amendment claim here.  He only claims that the prosecutor "shifted the burden of proof."  The prosecutor did not do so.  Where there are witnesses other than the defendant who could have been called to refute a point made by the prosecution, it is permissible for the prosecution to comment on the defendant's failure to rebut that proof.  *Byrd v. Collins*, 209 F.3d 486, 534 (6th Cir. 2000).  Moreover, the trial court properly instructed the jury that the prosecution had the burden of proof and Moore did not have to present a defense.  Finally, the evidence of Moore's guilt was overwhelming.  *Moore*,

689 N.E.2d at 5–6.  Moore failed to show that the prosecutor engaged in misconduct.
*See Bates*, 402 F.3d at 641.

**Claim (19)**

Moore alleges that his statements to the police were admitted in violation of his
*Miranda* rights and his rights to counsel, due process, and equal protection.  He asserts
that the Ohio Supreme Court failed to consider all of the circumstances that indicated
that his statements were involuntary and in violation of his right to counsel.

**Facts**

The facts as found by the state court establish the following sequence of events.
Police apprehended Moore and Kinley at around 5:30 p.m. on January 20, 1994, as they
waited for their order in the drive-through lane of a McDonald's.  *Moore*, 689 N.E.2d
at 6.  Moore was not advised of his *Miranda* rights at that time.  *Id*. at 10.  According to
Officer Michael Tiernan of the Fairfield police, Moore did not smell of alcohol or
marijuana, was not glassy-eyed, and his speech was not slurred.  *Id*.  Moore was placed
in a holding cell at the Mt. Healthy police department.  *Id*.  Detective Jeff Armontrout
took items of Moore's clothing as evidence, leaving Moore bare-chested.  He used a
blanket in the cell to cover himself.  No one fed Moore while he was in the holding cell,
and Moore did not request anything to eat or drink.  *Id.*

Officer Tiernan advised Moore of his *Miranda* rights around 12:10 a.m.  Moore
indicated that he understood his rights and signed the waiver form.  He did not ask to
speak to an attorney.  *Id*. at 10–11.  Mt. Healthy Assistant Police Chief Dennis Ohmer
transported Moore to the downtown Cincinnati police station.  Moore had a jacket but
was not wearing shoes, and had to walk approximately thirty feet through slush and
snow.  *Id.* at 10.  Moore was placed in an interview room and remained in handcuffs
until he was questioned.  *Id.* at 12.  Around 5:00 a.m., Officer Tiernan and Cincinnati
Police Homicide Unit investigator David Feldhaus began interviewing Moore. Feldhaus
showed Moore the *Miranda* rights form that Moore had already signed, Moore said he
understood his rights, and he acknowledged his signature at the bottom of the form.

When Feldhaus asked Moore whether he wanted anything to eat or drink, Moore requested, and was provided, water. The interview lasted for over an hour and a half, including breaks. At approximately 6:30 a.m., Moore admitted that he had robbed, kidnapped, shot, and killed Olinger; he claimed that the shooting was accidental. *Id*. at 6. Moore appeared clear-headed throughout the interview. *Id*. at 11.

Moore disputed several aspects of the officers' testimony. He said that he last ate at 9:00 a.m. on the day he was arrested, and had smoked a large marijuana cigar. According to Moore, he was never offered food or water while in the Mt. Healthy holding cell. Moore also said that he was handcuffed with his hands behind his back for three hours before his interview with Tiernan, that he requested an attorney when Tiernan advised him of his rights but Tiernan ignored him, that Feldhaus never offered him anything to eat or drink, that he requested an attorney again when Feldhaus showed him the rights form and waiver, that he was not told that he was a suspect in an aggravated murder investigation, and that he requested an attorney a third time. *Id*.

**Procedure**

Moore raised this claim at the suppression hearing before trial and again on direct appeal. The Ohio Supreme Court reviewed the suppression hearing held by the trial court and found conflicting accounts of the events leading up to Moore's statement to the police. The court deferred to the trial court's decision to resolve all conflicts in testimony in favor of the state. *Id*. at 12. The court concluded that the evidence supported the trial court's findings that Moore was properly advised of his *Miranda* rights and that he understood those rights when he signed a waiver form. *Id*. at 11. The court found several aspects of Moore's detention troubling, including the testimony that the police officers did not provide Moore with food or drink while he was in a holding cell, they required him to walk in the snow in sub-freezing temperatures in his stocking feet, and they kept his hands cuffed behind his back for over three hours as he sat in an interview room. The court concluded, however, that the totality of the circumstances indicated that Moore made a knowing, voluntary, and intelligent waiver of his constitutional rights. *Id*. at 12.

The district court found that Moore's treatment by the police was unnecessarily harsh but that the police advised Moore of his *Miranda* rights, had him sign a waiver, and had him re-affirm that waiver before they interrogated him. The court deferred to the state courts' factual finding that there was no credible evidence that Moore requested an attorney either before or during his custodial interrogation. The district court concluded that the Ohio Supreme Court's decision was not an unreasonable application of Supreme Court precedent. *Moore*, 531 F. Supp. 2d at 912–15.

**Analysis**

In *Miranda v. Arizona*, 384 U.S. 436, 478 (1966), the Supreme Court held that under the Fifth Amendment, a suspect may not be subjected to custodial interrogation until he has been informed that he has a right to counsel, that he has a right to remain silent, and that anything he says can be used against him in a court of law. To be valid, a waiver of these rights must be voluntary, knowing, and intelligent. *Colorado v. Spring*, 479 U.S. 564, 573 (1987). To determine whether a waiver is valid, courts examine the totality of the circumstances. *Fare v. Michael C.*, 442 U.S. 707, 724–25 (1979) (citing *Miranda*, 384 U.S. at 475–77). Courts consider a number of factors, including "the age, education, and intelligence of the suspect; whether the suspect was advised of his *Miranda* rights; the length of the questioning; and the use of physical punishment or the deprivation of food, sleep or other creature comforts." *Jackson v. McKee*, 525 F.3d 430, 433–34 (6th Cir. 2008) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). "A confession is involuntary only if there is (1) police coercion or overreaching which (2) overbore the accused's will and (3) caused the confession." *Hill v. Anderson*, 300 F.3d 679, 682 (6th Cir. 2002) (citing *Colorado v. Connelly*, 479 U.S. 157, 165–66 (1986)).

The Ohio Supreme Court identified the proper precedent by which to examine Moore's claim and did not apply it unreasonably. The Ohio Supreme Court cited *North Carolina v. Butler*, 441 U.S. 369, 374–75 (1979), for the proposition that an accused's signed waiver form is strong proof that the waiver was valid. *Moore*, 689 N.E.2d at 11–12. In *Butler*, the Court wrote that: "An express written or oral statement of waiver

of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." 441 U.S. at 373. The court also cited *Connelly* in support of its conclusion that the totality of the circumstances did not show that "Moore's 'will was overborne' or that his 'capacity for self-determination was critically impaired because of coercive police conduct.'" *Moore*, 689 N.E.2d at 12 (quoting *State v. Otte*, 660 N.E.2d 711, 719 (Ohio 1996)). In *Connelly*, the Court held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" 479 U.S. at 167.

We, too, find that the circumstances surrounding Moore's statement are troubling. The police officers did not provide Moore with food or drink while he was in the holding cell, they required Moore to walk in the snow and slush in sub-freezing temperatures in his stocking feet, and they kept Moore's hands cuffed behind his back for over three hours while he sat in the interview room. Over twelve hours elapsed between the time Moore was arrested and the time he gave his statement. At nineteen and with a single juvenile offense, Moore was not experienced with the criminal justice system.

On the other hand, Moore is of average intelligence, did not appear intoxicated when he was arrested, and did not request food when it was offered. Moore was read his *Miranda* rights, signed a waiver form, and acknowledged understanding his rights just before he was questioned. The questioning itself was not prolonged or repeated, lasting about an hour and a half. The police subjected Moore to physical discomfort but did not use any other overtly coercive tactics that overbore Moore's will and caused his confession. *See Connelly*, 479 U.S. at 165–66; *Hill*, 300 F.3d at 682. The police did not overbear his will by questioning him endlessly until he finally cracked. The interview occurred many hours after his initial arrest, but for most of that time, he was simply waiting (albeit uncomfortably). He was not enduring harassment and threats. No physical violence was used on him. In view of the signed waiver, the lack of coercion by the police, and the trial court's finding that Moore did not ask for an attorney, the state court's conclusion that the totality of the circumstances indicated that Moore waived his rights was not unreasonable.

Moore argues that a police officer contradicted the earlier *Miranda* warning by advising Moore that his statement would actually help him, citing *Hart v. Att'y Gen.*, 323 F.3d 884, 894 (11th Cir. 2003). In *Hart*, the defendant was advised of his *Miranda* rights and signed a waiver. A police officer whom the defendant trusted told him, when asked, the pros and cons of asking for an attorney, and advised the defendant that "honesty wouldn't hurt him." The court concluded that under the totality of the circumstances, including the defendant's trust of the officer and her statements contradicting the *Miranda* warnings, the defendant's waiver was the product of the officer's deception and was not voluntary, knowing, and intelligent, and the state court's rejection of the claim was contrary to clearly established federal law. *Id.* at 895.

At the suppression hearing, Moore testified that, after showing him the *Miranda* waiver he had signed earlier, Feldhaus asked him to give a statement. Feldhaus used an example of someone who runs over a pedestrian either accidentally or intentionally. Moore testified,

> [Feldhaus] said if there's a man on the street and there's a car come [sic] speeding in the street and he doesn't see him and he runs him over, that that's murder, but it's accidental. And he said that's different than driving in the street and seeing a man and actually stepping on the gas to kill him. And he said that if, if I didn't make a statement, that it would look like I stepped on the gas and killed the man. He said that it could have possibly been an accident and he told me that I should make a statement.
>
> Q: Okay. So he was telling you that it would be better to say that it was accidental and he also stated that it would go easier on you; is that correct?
>
> A: Yes.

However, Feldhaus denied ever making such comments.[18] The state court credited Feldhaus's version of events and we must defer to that determination unless Moore can produce clear and convincing evidence that contradicts it. Moore cites no such evidence.

---

[18] In his Fourth Brief, Moore's counsel states, without citation, that Officer Feldhaus admonished Moore that "it would be better to say that it was accidental and . . . it would go easier on you." In fact, however, that quote comes not from Feldhaus but from Moore's trial counsel at the suppression hearing, summarizing Moore's own testimony back to him. At the suppression hearing, Officer Feldhaus specifically denied making such statements or using the car analogy to which Moore refers.

Even accepting Moore's account of what Feldhaus said, Feldhaus encouraged Moore to make a statement but did not contradict the *Miranda* warnings Moore received earlier.

In the alternative, any error in admitting Moore's statement into evidence was harmless. The admission of an involuntary statement at trial is subject to harmless error analysis. *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). The court assesses the prejudicial impact of constitutional error under the "substantial and injurious effect" standard set forth in *Brecht*. *Fry*, 551 U.S. at 121–22. On habeas review, this standard applies whether or not the state courts recognized the error. *Id.*

Moore's statement did not have substantial and injurious effect on the jury's verdict. First, although Moore admitted kidnapping, robbing, and shooting the victim, he told the police the shooting was accidental. *Moore*, 689 N.E.2d at 6. Thus, the jury could not have convicted him of aggravated murder based upon the statement he gave police. Second, Moore's accomplice provided ample testimony against him. Kinley testified that, as Moore drove to a factory area, he told Kinley that he was going to kill the victim and that they would not get caught. Once at the factory area, Kinley heard Moore tell the victim to empty his pockets and move to a corner by the dumpster, heard the victim beg for his life, and heard a gunshot. Kinley testified that Moore laughed about the shooting. *Id*. at 7. Thus, apart from Moore's statement, the jury heard that Moore planned to kill the victim, robbed him, and laughed about the killing afterwards. There was sufficient evidence even without his statement for the jury to conclude that Moore murdered the victim.

## CONCLUSION

Accordingly, and for the reasons set forth above, we **REVERSE** the district court's grant of habeas relief with respect to Moore's claims of ineffective assistance of counsel at sentencing and improper jury instructions, and **AFFIRM** the district court's denial of habeas relief with respect to all other claims.

———————————

**DISSENT**

———————————

MERRITT, Circuit Judge, dissenting.  I dissent from the court's ruling on Petitioner Moore's ineffective assistance of counsel claim arising from the testimony of Dr. Chiappone, discussed under the heading "Claim (2)(B)" of the majority opinion.

The majority opinion asserts that this Court is faced with a "novel question stemming from *Pinholster:* May a federal habeas court consider additional evidence not before the state courts . . . when the parties jointly move to expand the record?"  The fact is, as the majority admits in Footnote 10, the district court did not rely on the new evidence in rendering its decision.

Indeed, neither the magistrate judge nor the district court judge even cited the additional deposition evidence, which the majority contends is prohibited under *Pinholster*.  The only citations in the opinion are to the trial court transcripts.  Based on that record, the magistrate judge found and the district court agreed that the Ohio Supreme Court's decision finding no Sixth Amendment violation was "objectively unreasonable" under *Strickland v. Washington*, 466 U.S. 668 (1984), *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Rompilla v. Beard*, 545 U.S. 374 (2005).  The district court judge agreed.  It found that counsel was so ineffective as to be unaware that their own witness would turn their prime mitigation evidence of remorse and lack of intent on its head.  This contention has nothing to do with "residual doubt," *Pinholster* or "jurisdiction."  The Court has simply not responded to the straightforward ineffective assistance of counsel arguments that petitioner makes.

A fairminded jurist need look no further than the trial transcript to conclude that counsel was grossly deficient in this case.  First, the defendant's strongest theory of mitigation was the same theory he maintained throughout the guilt phase, namely that the shooting was accidental and he was honest in relaying this information to authorities.  The Defense's only expert witness, Dr. Chiappone, testified to just the opposite, undermining the defense's theory, the defendant's credibility, and any hope of proving

the mitigating factor of remorse. As his attorney stated later in depositions, "I believed at that time he was going to get the death penalty, based on what Dr. Chiappone said. He was cooked." (Jt. Apx. Pg. 1888-89).

Unfortunately for Moore, counsel's incompetence did not end with the apparent lack of preparation or anticipation of this devastating testimony. Instead of attempting to explain or rehabilitate Dr. Chiappone's testimony, counsel remained silent on that very issue during his entire closing argument. The lawyer, Timothy Deardorff, later explained his rambling and destructive closing argument as a panicked response to Dr. Chiappone's testimony, which he described as getting "hit with a bean ball" and having to go to bat again. (Jt. Apx. Pg. 1897). The jury never heard this reasoning, of course. Instead, the jury heard from defense counsel a litany of reasons to give Moore the death penalty. Deardorff told the jury that a long sentence in jail was not fair to the victim's family. (T.p. 1214). He also inexplicably stated, "I mean if you shoot somebody in the head and you're in a little area and his brains fly out all over the wall, that is going to have an effect." (T.p. 1204). After all of this, he all but invited the jury to return a death verdict: " I know I wouldn't want to go to jail for 73 years. I'd rather you put me to death." (T.p. 1221).

A simple reading of this trial transcript provides overwhelming evidence of a blatant Sixth Amendment violation. The later developed deposition testimony, albeit unnecessary for the district court's determination to issue the writ, further emphasizes the incompetence of the lawyers in this case. Both of Moore's lawyers testified that they were shocked and surprised at Dr. Chiappone's testimony, believing that they had been "sandbagged" by their own expert. (Jt. Apx. Pg. 1779). Yet, the lawyers cannot explain why, after receiving messages from their expert that he was going to meet with the prosecutor just days before his testimony, they never asked him one question about the content of this hour-and-a-half meeting and never stopped him from meeting with opposing counsel in the first place. When asked if he discussed this ex parte meeting with Dr. Chiappone, lead counsel, Daniel James, simply stated, "No. I'm sure I did not discuss it, I wasn't aware of it." (Jt. Apx. Pg. 1752). He put his chief mitigation witness

on the stand in a death penalty case without knowing what he was going to say. How much more incompetent can a criminal defense lawyer get?

The court's opinion on ineffective assistance of counsel arising from Dr. Chiappone's testimony is in direct conflict with the similar ineffective assistance cases of *Stevens v. McBride*, 489 F.3d 883 (7th Cir. 2007), and *Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000). In both of those cases the same thing happened with the main expert witnesses in death penalty cases. In *Stevens*, the court said that "it is uncontested that Stevens's lawyers knew nothing about the content of Dr. Lennon's planned testimony." The Court concluded:

> This is a complete failure of the duty to investigate with no professional justification. Where an expert witness's opinion is "crucial to the defense theory[,] defense counsel's failure to have questioned [the expert] . . . prior to trial is inexcusable."

489 F.3d at 896 (quoting *Combs*, 205 F.3d at 288).

In addition to the portion of the *Combs* case quoted in *Stevens* by the Seventh Circuit, the Sixth Circuit opinion notes that Dr. Fisher, the expert in *Combs*, like Dr. Chiappone in the instant case, "testified to the opposite" of the reason he was put on the stand. *Id.* The Court explains:

> Defense counsel should have known Fisher's opinion on this ultimate issue and should have prepared accordingly.
>
>     Regardless of whether Combs's counsel should have known or instead actually knew Fisher's opinion regarding Combs's intent, however, counsel's decision to put him on the stand was objectively unreasonable. . . . Combs could not have been acting purposefully. Fisher's testimony directly contradicted the sole defense theory that Combs lacked the requisite intent to commit murder. . . . Furthermore, not only did Fisher's testimony destroy any hope of a successful intoxication defense, but it also helped the prosecution to establish one of the elements of its case in chief. Quite simply, this testimony was completely devastating to the defense, and counsel's decision to present it was objectively unreasonable. *Id.*

The majority opinion in the instant case cannot be reconciled with the *Combs* and *Stevens* cases. Nor can it be reconciled with common sense. The Sixth Amendment

does not allow lawyers who are so negligent that they put on the stand a key expert witness who then testifies directly contrary to his client's interest and establishes the key element of the prosecution's case ("premeditation").

Here, Dr. Chiappone became in effect a witness for the prosecution. Without Dr. Chiappone's testimony, the Defense's mitigation theory of remorse and an accidental shooting may well have convinced one or more jurors. The district court correctly recognized that Moore has shown prejudice, and thus, the Ohio Supreme Court's decision that counsel was effective in this case was objectively unreasonable under the Supreme Court's line of cases expounding on the Sixth Amendment right to counsel. The Sixth Amendment rejects as incompetent lawyers who are so negligent that they put on the stand a key expert who then testifies directly contrary to his client's interest and establishes the key element of the prosecution's case.

A discussion of *Pinholster* is unnecessary in this case. After all, the district court, as the majority apparently concedes, looked exclusively at the state record in determining that the Ohio state courts had unreasonably applied federal law. The district court then determined that both *Strickland* prongs were met and found ineffective assistance of counsel. This case is perhaps one of the rare and more unfortunate ones where the state trial court record is so full of obvious malpractice that a finding of ineffective assistance was simple, based only on the state trial court record. The Supreme Court never discusses *Pinholster* as a "jurisdictional" bar. The State never argued that *Pinholster* was "jurisdictional." The majority's contention to this effect comes out of thin air and is neither grounded in *Pinholster* nor habeas law. It appears to create a fictional obstacle where there is none. The majority seems somehow to read *Pinholster* in such a fashion as to eliminate any possible federal review. If this result is what is meant then it is obviously wrong and deeply confused about the meaning of *Pinholster* in this case. It is unclear to me what the majority intends to accomplish by a discussion of jurisdiction and waiver in connection with *Pinholster*.